**HI-G, INCORPORATED, Plaintiff,**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 65–815.**

United States District Court
D. Massachusetts.

Sept. 14, 1967.

Edward H. Resnick, Robert F. Sylvia, of Fine & Ambrogne, Boston, Mass., for plaintiff.

Lionel H. Perlo, Ficksman, Conley, Feld, Perlo & Leone, Boston, Mass., for defendant.

OPINION

FRANCIS J. W. FORD, District Judge.

Plaintiff brings this action to recover under a manufacturer's output insurance policy issued to it by defendant to recover for a loss caused by the damaging of

certain relays during the course of the manufacturing process.

Plaintiff has a manufacturing plant in Windsor Locks, Connecticut, where, among other products, it makes small electro-mechanical switching devices known as relays. In the course of manufacture these relays are placed in an industrial oven for a period of several hours. A vacuum pump attached to the oven is operated to create a vacuum environment within the oven and remove oxygen from the interior of the relays. The oven is then filled with nitrogen which then fills the interior of the relays. The relays are then taken from the oven in small lots and sealed to preserve the nitrogen atmosphere inside them. This treatment is for the purpose of giving longer life and greater reliability to the relays.

On July 14, 1965 plaintiff's employees placed 5877 relays in an electric oven where they were to remain over night with the oven in operation. During the evening of July 14 there was a brief interruption of electric power supply to the plant. When the power to the oven was interrupted certain parts of the oven, namely, the booster pump, the mechanical pump and the oil circulation pump shut off and the valve between the booster pump and the oven closed. When power was resumed the valve opened and the booster pump started again, but the other two pumps remained off. Because of the vacuum environment within the oven oil vapor from the booster pump was drawn into the oven and covered the internal and external surfaces of the relays.

On the morning of July 15 employees of plaintiff discovered what had happened. Efforts were made to clean the relays but the oil film which had settled on the contact points had made most of them non-operational. In all, 5042 relays, having a value of $28,166.43, were damaged beyond repair. These had a total salvage value of $1,387.82, or a net salvage value, after deducting costs of salvage of $126.28 of $1,261.54. The remaining 835 relays were made operational at a cost of $1,454.78. The total monetary loss to plaintiff was $28,359.67.

Defendant contends that it is not liable for payment of this loss because the loss falls within one or both of the following exclusions contained in paragraph 4 of the policy:

"4. PERILS EXCLUDED: This policy does not insure against * * * *

"(h) Loss or damage caused by or resulting from dampness of atmosphere, dryness of atmosphere, extremes or changes of temperature, shrinkage, evaporation, loss of weight, rust, contamination, change in flavor or color or texture or finish, unless such loss or damage is caused directly by fire, lightning, windstorm, hail, explosion, riot or civil commotion, aircraft, vehicles other than transporting conveyances, bursting of pipes or apparatus, vandalism, malicious mischief, theft, attempted theft or casualty occurring to a vessel or other vehicle used in transporting the property.

"(i) Damage sustained while the property is being actually worked upon and directly resulting therefrom, other than damage from ensuing fire or explosion."

\* \* \* \* \* \*

Under exclusion 4(h) the sole question is whether the damage to the relays was "contamination" within the meaning of the policy. Plaintiff's position is that there is no contamination of a product unless as a result of the action of some outside substance there is an actual physical change in the form or substance of the product itself, as when spoilage of food occurs as a result of the entry of bacteria whose action causes a change in the substance of the food.

Contamination, however, cannot be so narrowly restricted in meaning. " 'Contamination' connotes a condition of impurity resulting from mixture or contact with a foreign substance." American Casualty Company of Reading, Pennsylvania v. Myrick, 304 F.2d 179, 183, 96 A.L.R.2d 1352. In Webster's Third New International Dictionary and Webster's

Seventh New Collegiate Dictionary, "contaminate" is defined as meaning "to make unfit for use by introduction of unwholesome or undesirable elements", and it is said that contamination implies "intrusion of or contact with an outside source as its cause." While the introduction of an outside element may change the product itself, it is not essential to contamination that it do so.[1]

■ What happened in this instance is clearly a case of contamination. An undesirable element, oil vapor, was introduced into the relays from an outside source, and it was precisely the intrusion of this outside element and its presence within or in contact with the relays that rendered them unfit for the use for which they were intended.

■ Paragraph 4(i) of the policy excludes "damage sustained while the property is being actually worked upon and directly resulting therefrom." Plaintiff contends that this applies only to damage where the product is "rendered non-saleable by reason of some error committed by an individual workman while he is in the course of assembling the product." Nothing in the wording of the exclusion expressly limits it to situations where the product is actually being handled by a workman. In these days of automation it is common knowledge that many steps in manufacturing processes are carried out by machinery without the intervention of human hand or even the constant presence of any human being to observe or control the procedure. Such was the case here. The procedure for removing the oxygen from the relays, later replacing it with nitrogen and sealing the relays was an essential step in the manufacturing process. While the relays were in the oven and undergoing the performance of this process, it seems fair to say that they were being actually worked on.

The damage resulted directly from this work through the failure of the component parts of the oven to function as they should have after the power interruption.

The conclusion is that plaintiff cannot recover here because the loss it suffered was excluded from coverage by paragraphs 4(h) and 4(i) of the policy.

Judgment will be entered for defendant.

---

1. Etymologically the notion of harm through touch or contact is basic to the meaning. Both "contaminate" and "contact" are derived ultimately from the Latin "tangere," "to touch." A thing may be contaminated when it is corrupted by the touch or contact of an external object, even though it does not itself change in form or substance. "Shall we now contaminate our fingers with base bribes * * *." Shakespeare, Julius Caesar IV, iii, 24.