RICHLAND VALLEY PRODUCTS, INC., a Wisconsin corpora-
tion, Plaintiff-Respondent-Cross Appellant,†

v.

ST. PAUL FIRE & CASUALTY COMPANY, a Wisconsin
insurance corporation, Defendant-Appellant-Cross-
Respondent.

Court of Appeals

*No. 94–1837. Oral argument June 21, 1995.—Decided March
28, 1996.*

(Also reported in 548 N.W.2d 127.)

For the defendant-appellant-cross respondent the cause was submitted on the brief of *Daniel W. Hildebrand* and *Joseph A. Ranney* of *Ross & Stevens, S.C.* of Madison, and *Douglas G. Houser* and *Stuart D. Jones* of *Bullivant, Houser, Bailey, Pendergrass & Hoffman* of Portland, OR. Orally argued by *Daniel W. Hildebrand*.

For the plaintiff-respondent-cross appellant the cause was submitted on the brief of *Ralph A. Weber*, *Paul F. Heaton* and *Clay C. Greene* of *Kravit, Gass & Weber, S.C.* of Milwaukee. Orally argued by *Paul F. Heaton*.

Brief of Amicus Curiae, Civil Trial Counsel of Wisconsin, was filed by *Timothy J. Muldowney* and *Noreen J. Parrett* of *La Follette & Sinykin* of Madison.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J.    St. Paul Fire & Casualty Company appeals from a judgment for $9,098,545.65 in favor of Richland Valley Products for breach of contract and for bad faith denial of Richland's insurance claim, and from a judgment in favor of Richland Valley Products awarding taxable costs in the amount of $31,178.39. We conclude that the dispositive issue is whether, as a matter of law, St. Paul's policy covered Richland's loss. Because we conclude the loss is not covered, we reverse without reaching the other issues presented in the appeal and Richland's cross-appeal.

Both parties moved for summary judgment. St. Paul sought dismissal of the complaint on grounds of policy exclusions, and Richland sought summary judgment on grounds that coverage exists. The trial court denied St. Paul's motion and granted Richland's.

Because both parties moved for summary judgment, we may assume that the pertinent facts regarding coverage are undisputed. *Powalka v. State Mut. Life Assurance Co.*, 53 Wis. 2d 513, 518, 192 N.W.2d 852, 854 (1972). Moreover, Richland does not dispute St. Paul's statement of the pertinent facts. The facts being undisputed, whether coverage exists is a question of law. *Thompson v. Threshermen's Mut. Ins. Co.*, 172 Wis. 2d 275, 280, 493 N.W.2d 734, 736 (Ct. App. 1992). We decide the coverage issue independently of the trial court's opinion. *Id.*

164

Richland has manufactured ice cream bars and other ice cream and frozen water novelties since early 1992. Its plant contains various machines to manufacture and package novelties, including a twenty-year-old used molding machine called the "Gram II" machine.

Some of Richland's manufacturing machines, including the Gram II, must be kept at temperatures well below freezing in order to make novelties of good quality. To that end, the Gram II has a helical coil composed of a number of coil pipes. The coil is submerged in a large vat filled with a brine solution of water and calcium chloride. The coil is connected to the plant's refrigeration system and filled with ninety-nine percent pure liquid ammonia. The ammonia is kept at a temperature of about minus eighty-five Fahrenheit, well below the temperature of the brine. The coil keeps the brine at a temperature low enough to cool the molds to a proper temperature. Because heat moves from the brine to the coil, ammonia is circulated through the coil system so that it can be recooled at the point of origin.

The Gram II is connected to the plant's central refrigeration system. The system pumps liquid ammonia refrigerant through a network of piping to other production machinery and the cold storage inventory area.

On August 10, 1992, Richland began experiencing difficulty in maintaining low temperatures in the Gram II and other machines. It investigated the problem and notified St. Paul and another of its insurers of a loss. Those companies and Richland hired engineers to determine the cause of the problem. The engineers determined that the problem happened in the following manner:

When the Gram II machine was originally built, a cooling coil was welded to support struts in the machine. When the welder attached the coil to its support struts, the welder allowed the strut or welding material to penetrate the walls of the coil, leaving holes in the coil. After welding, the coil was galvanized and the holes were coated with a thin skin of metal. The coating eventually deteriorated, exposing the holes.

When the holes appeared, brine entered the coil. The brine and ammonia in the coil mixed, and calcium chloride and ammonium chloride salts crystallized and precipitated out of the solution. The salts clogged the piping system and spread to other parts of the refrigeration system. The clogging reduced the system's efficiency, forcing Richland to shut down its entire manufacturing operation in order to eliminate the clogging.

St. Paul's Output Protection Policy (MOP Policy) contains the following coverage provisions:

> What This Agreement Covers. We'll protect insured property against risks of direct physical loss or damage except as excluded in the Exclusions-Losses We Won't Cover Section of this agreement.

The policy contains the following "Failure/Faulty Work Exclusion" clause:

> **Mechanical Breakdown.** We won't cover loss to covered property caused or made worse by:
> mechanical breakdown;
> failure;
> derangement of mechanical parts;
> rupture caused by centrifugal force; or defects due to faulty work, design, materials or manufacture.

But if a loss not otherwise excluded results, we'll pay for the loss that results directly from the covered cause.

The MOP policy also contains the following "Contamination Exclusion" clause:

**Corrosion - inherent nature - animals.** We won't cover loss or damage caused or made worse by:

mold, wet or dry rot, rust, corrosion, or contamination including fungal or bacterial contamination;

. . . .

If a loss that would otherwise be covered results from one of these causes, we'll pay for the direct loss that results.

■

We begin with a statement of the principles we must employ when deciding if coverage exists. Whether coverage exists requires judicial construction of the policy. That requires an examination of the language of the policy.

In Wisconsin, the construction of contracts of insurance should be made with an aim toward effecting the true intent of the parties and the extent of policy coverage. *Limpert v. Smith*, 56 Wis. 2d 632, 203 N.W.2d 29 (1973); *Schuhknecht v. Robers*, 192 Wis. 275, 212 N.W. 657 (1927). The test "is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood them to mean." *Ehlers v. Colonial Penn Ins. Co.*, 81 Wis. 2d 64, 74-75, 259 N.W.2d 718 (1977) (citation omitted). When a policy is clear and unambiguous on its face, the terms of that policy should not be rewritten by construction

to bind an insurer to a risk it never contemplated or was willing to cover, and for which it was never paid. *Limpert*, 56 Wis. 2d at 640. However, when the terms of the policy are ambiguous or obscure, the policy must be strictly construed against the drafter of the policy, the insurance company. *Wisconsin Builders, Inc. v. General Ins. Co.*, 65 Wis. 2d 91, 103, 221 N.W.2d 832 (1974). Words or phrases in a contract are ambiguous when they are "reasonably or fairly susceptible to more than one construction." *Stanhope*, 90 Wis. 2d at 849.

*Gonzalez v. City of Franklin*, 137 Wis. 2d 109, 122, 403 N.W.2d 747, 752 (1987).

With these principles in mind, we continue with our analysis of the policy before us in light of the uncontroverted facts on which coverage exists or falls.

### CONTAMINATION

Richland's serious losses have been traced to the welder's error when Gram II was manufactured. The welder's error caused the defect in the coil which led to the brine's entering the coil and mixing with the ammonia. Because the defect was due to faulty workmanship and manufacture, the resulting loss is excluded under the "Failure/Faulty Work Exclusion," unless "a loss not otherwise excluded result[ed]." We therefore examine the "contamination exclusion." The question is, as St. Paul contends, whether loss or damage was caused or made worse by "contamination."

The trial court concluded that because each side in this litigation reads the term "contamination" differently, it is ambiguous and must be construed against the insurer, St. Paul. That is not the test for ambiguity. A policy term is ambiguous only if it is reasonably sus-

ceptible to more than one construction. *Garriguenc v. Love*, 67 Wis. 2d 130, 135, 226 N.W.2d 414, 417 (1975). A policy term is not ambiguous merely because the parties disagree as to its meaning. *U.S. Fire Ins. Co. v. Ace Baking Co.*, 164 Wis. 2d 499, 503-04, 476 N.W.2d 280, 282 (Ct. App. 1992); *Bartel v. Carey*, 127 Wis. 2d 310, 314, 379 N.W.2d 864, 866 (Ct. App. 1985).[1]

The term "contamination" as used in St. Paul's policy is unambiguous. Other jurisdictions have almost uniformly construed the term in insurance policies in light of modern dictionary definitions and concluded that it is unambiguous. As said in *American Casualty Co. of Reading, P.A. v. Myrick*, 304 F.2d 179, 183 (5th Cir. 1962), contamination "connotes a condition of

---

[1] The same principle applies to statutory construction. Ambiguity arises in a statute when its language "may be reasonably construed in two different ways." *K.L. v. Hinickle*, 144 Wis. 2d 102, 109, 423 N.W.2d 528, 531 (1988). For that reason, "ambiguity does not arise just because persons unreasonably reach different conclusions." *Girouard v. Jackson Cir. Ct.*, 155 Wis. 2d 148, 155, 454 N.W.2d 792, 795 (1990). As the *Girouard* court said, "The litigants cannot [by disagreeing] limit the legal responsibility of the court to make that determination." *Id. See also Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98, 103 (1995) (that two parties interpret statute differently does not in itself create an ambiguity).

Were the principle otherwise in insurance law, merely by asserting an alternative reading for otherwise plain words, a party to an insurance contract could create an ambiguity where none exists. Such a principle would invariably lead to policy disputes being resolved in favor of the insured. *See Wisconsin Builders, Inc. v. General Ins. Co.*, 65 Wis. 2d 91, 103, 221 N.W.2d 832, 838 (1974) (ambiguous term insurance policy is normally construed in favor of the insured and against the insurer).

impurity resulting from mixture or contact with a foreign substance," and that it means "to make inferior or impure by mixture; an impairment of impurity; loss of purity resulting from mixture or contact," a definition the court found consistent with common understanding and WEBSTER'S NEW INTERNATIONAL DICTIONARY. Even if exclusions from all-risk policies are construed narrowly and in favor of the insured, the term "contamination" is plain. *Auten v. Employer's Nat. Ins. Co.*, 722 S.W.2d 468, 470 (Tx. Ct. App. 1986). "Contamination occurs when a condition of impairment or impurity results from mixture or contact with a foreign substance." *Id.* at 469, *citing American Casualty Co. of Reading, P.A.*, 304 F.2d at 183. The Ohio Court of Appeals said regarding a contamination exclusion, "Giving the word 'contaminate' its usual and ordinary meaning, it means 'to render unfit for use by the introduction of unwholesome or undesirable elements.'" *Hartory v. State Auto Mut. Ins. Co.*, 552 N.E.2d 223, 225 (Ohio Ct. App. 1988), *citing* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 491 (1981). *See also Raybestos-Manhattan v. Indus. Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. Ct. 1981) (citing dictionary definition).

"Contamination" may describe damage to food, as in *American Casualty Co. of Reading, P.A.*, 304 F.2d at 181-83, where ammonia rendered refrigerated food stuffs unfit for human consumption, but "contamination" is by no means limited to food spoilage. In *Hi-G, Inc. v. St. Paul Fire & Marine Ins. Co.*, 283 F.Supp. 211 (D.C. Mass. 1967), *aff'd* 391 F.2d 924 (1st Cir. 1968), plaintiffs manufactured small switching devices or relays. During their manufacture, the relays were placed in an industrial oven. Oil vapor was accidently drawn into the oven and covered the relays in it. The *Hi-G* court said that contamination cannot be

restricted to food spoilage occurring as the result of bacteria. Rather, " 'contamination' connotes a condition of impurity resulting from mixture or a contact with a foreign substance." *Id.* at 212. It means "to make unfit for use by introduction of unwholesome or undesirable elements," *id.* at 212-13, citing WEBSTER'S THIRD INTERNATIONAL DICTIONARY, and implies "intrusion of or contact with an outside source as its cause." *Id.* at 213. The court said,

> What happened in this instance is clearly a case of contamination. An undesirable element, oil vapor, was introduced into the relays from an outside source, and it was precisely the intrusion of this outside element and its presence within or in contact with the relays that rendered them unfit for the use for which they were intended.[2]

*Id.*

The *Hi-G* court's holding that contamination is not limited to food spoilage is consistent with rulings by other courts. In *Auten*, 722 S.W.2d at 469-71, the court held that fogging the plaintiff's home with an above-normal level of an oil-based pesticide "contaminated" the home, within the meaning of a contamination exclusion. In *Hartory*, 522 N.E.2d at 225, a contamination exclusion applied when methane gas seeped from a landfill into plaintiffs' home and rendered it and a well unfit for use. And in *J&S Enterprises v. Continental Cas. Co.*, 825 P.2d 1020, 1024 (Col. Ct. App. 1991), asbestos fibers released during a store renovation were held to come within an "unambiguous" contamination exclusion. See also *Falcon Products, Inc. v. Ins. Co. of*

---

[2] A contaminate need not effect an actual physical change in the form or substance of the product itself. *Hi-G, Inc.,* 283 F.Supp. at 212. The First Circuit agreed, *Hi-G*, 391 F.2d at 925.

*P.A.*, 615 F.Supp. 37, 39 (D.C. Mo. 1985), *aff'd* 782 F.2d 779 (8th Cir. 1986), where plaintiff conceded that radioactive scrap metal plaintiff purchased and used in its products was "contaminated."

Here the trial court also reasoned that contamination had not occurred because after the galvanizing broke loose, in "a very short process, a few hours from possibly as much as a day or two," the refrigeration system malfunctioned. The court looked to the conditions listed in the contamination exclusion clause, "mold, wet or dry rot, rust, corrosion or contamination," said that all are slow processes that occur over time, and concluded that the exclusion did not apply to Richland's loss.

We have located only one decision holding "contamination" must be a slow process. In *Largent v. State Farm Fire & Cas. Co.*, 842 P.2d 445 (Or. Ct. App. 1992), the plaintiff's tenants operated an illegal laboratory, creating airborne vapor and particulates which permeated porous materials in the apartment such as drapes, carpets and woodwork. Plaintiff argued, and the Oregon court agreed, that the "contamination exclusion" applies only when contamination happens over time. *Id.* at 446. We reject the *Largent* court's reasoning. It is contrary to the several cases we have cited from other jurisdictions in which contamination occurred during a short period. Moreover, time lapse has specifically been held irrelevant to application of another condition, "corrosion," listed in St. Paul's contamination exclusion clause. *See Arkwright-Boston Mfrs. v. Wausau Paper Mills Co.*, 818 F.2d 591, 595 (7th Cir. 1987) (concluding speed at which corrosion took place "not relevant to whether it falls under the corrosion exclusion").

Finally, the trial court concluded from the wording "contamination including fungal or bacterial contami-

nation" in St. Paul's policy that the exclusion is restricted to fungal or bacterial contamination. The court relied on the application of the doctrine of *ejusdem generis* in *Wisconsin Builders Inc. v. General Insurance Company*, 65 Wis. 2d 91, 221 N.W.2d 832 (1974). We conclude that the doctrine does not apply to St. Paul's contamination exclusion.

The *Wisconsin Builders* court construed a builder's risk policy which provided coverage for risks of direct physical loss to an apartment building while under construction. *Id.* at 93, 221 N.W.2d at 833. Part of the building collapsed. The policy covered the collapse unless an "earth movement" exclusion applied. That exclusion described "earth movement, including but not limited to earthquake, volcanic eruption, landslide, mud flow, earth sinking, earth rising or shifting." *Id.* at 94, 221 N.W.2d at 834. The *Wisconsin Builders* court said that most courts had found the exclusion ambiguous and had applied *ejusdem generis* to limit the definition of "earth movement." 65 Wis. 2d at 101-02, 221 N.W.2d at 837. After noting that on other occasions it had "recognized the applicability of the *ejusdem generis* rule in construing overly broad and ambiguous terms in insurance contracts," the supreme court applied the *ejusdem generis* rule to limit the earth movement exclusion. *Id.* at 103, 221 N.W.2d at 838.

*Wisconsin Builders* is not in point. The "contamination exclusion" in St. Paul's policy is neither overly broad nor ambiguous. For that reason, the *ejusdem generis* rule is inapplicable.

■ The case law satisfies us that St. Paul's contamination clause is unambiguous and applies to the undisputed facts. The question is then whether coverage nevertheless exists by virtue of the "ensuing loss"

clause following St. Paul's contamination clause, and we turn to that issue.

## "ENSUING LOSS"

St. Paul appears to take the position that because contamination occurred and loss or damage caused by contamination is excluded, further analysis is unnecessary. St. Paul's reasoning is based on the "ensuing loss" clause[3] immediately following the mechanical breakdown exclusion, since loss resulting from contamination is a loss "otherwise excluded." However, the policy contains two "ensuing loss" clauses. The contamination exclusion has its own "ensuing loss" clause. The question is whether the loss resulting from contamination is covered by virtue of the latter "ensuing loss" clause, the clause providing at the end of the contamination exclusion, "If a loss that would otherwise be covered results from one of these causes, we'll pay for the direct loss that results."

We first pinpoint the nature of the "contamination" and the loss it caused in the case before us. Contamination occurred when brine entered the coil and mixed with the ammonia in it. The two substances mixed, and they were not supposed to. The brine was foreign to the ammonia, and their mixing resulted in a loss of purity. That is contamination within the dictionary definitions and the case law from other jurisdictions construing and applying the term. The loss from the contamination is the impure ammonia.

St. Paul would extend the initial contamination beyond the mixing of ammonia and brine and the loss of pure ammonia to the crystallization and precipita-

---

[3] The parties use "ensuing loss" as a short-hand reference to the clause. The policy itself does not use the term.

tion of salts that the mixing caused, and then to the salts' spreading to and clogging the other parts of the system. We disagree with that extension. When the brine mixed with the ammonia, that was contamination. The crystallization and precipitation of salts out of the solution and circulation through the system resulted from the mixing. The question is whether the loss resulting from the crystallization and precipitation and the salt's spreading throughout and clogging the system is covered by virtue of the "ensuing loss" clause that accompanies the contamination exclusion. We conclude the resulting loss is not covered.

The clogging was a direct physical loss, but it was a loss which would not be otherwise covered because it was caused by the circulation of salt. The direct physical loss was caused by additional contamination, and loss caused by contamination is an excluded loss. To demonstrate that contamination resulted, we need only refer to the case law of other jurisdictions we have reviewed which held that particular losses described were excluded by virtue of a contamination clause. The contamination here is comparable to the contamination from the oil that covered relays in *Hi-G Inc.*, 283 F.Supp. at 213, to the pesticide that fogged a home in *Auten*, 722 S.W.2d at 469-70, to the methane gas which seeped into a home in *Hartory*, 552 N.E.2d at 225, and to the asbestos fibers released during a store renovation in *J&S Enterprises*, 825 P.2d at 1022.

The difference between those cases and the case before us is that the salt that circulated throughout and clogged Richland's system resulted from the initial contamination itself, the mixing of brine and ammonia, but it is as much an additional contamination as if somebody had injected salt from an outside source into

175

the piping which was used to circulate refrigerant.[4] Had the initial contamination resulted in fire, for example, that loss would have been covered under the ensuing loss clause. Loss by fire is a loss not otherwise excluded. But here the result was loss resulting from contamination, and loss caused by contamination is excluded from coverage.

From Richland's point of view, its loss is largely the lost earnings and other expenses it has had. However, those losses are not "due to a covered cause of loss" under the Blanket Earnings and Expense Coverage endorsement to St. Paul's policy. That endorsement provides,

> We'll pay your actual loss of earnings as well as extra expenses that result from the necessary suspension of your operations during the period of restoration *caused by direct physical loss or damage* to property at an insured location. The loss or damage must occur while this endorsement is in effect

---

[4] Thus, we do not use the analysis St. Paul proposes on the basis of *Acme Galvanizing Co. v. Fireman's Life Ins. Co.*, 270 Cal. Rptr. 405 (Cal. Ct. App. 1990), and *Chadwick v. Fire Ins. Exchange*, 21 Cal. Rptr. 2d 871 (Cal. Ct. App. 1993), but the result would be the same. The *Acme* court held that the ensuing loss provision in that case applied when "there is a 'peril,' i.e., a hazard or occurrence which causes a loss or injury, separate and independent but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues." *Acme*, 270 Cal. Rptr. at 411. St. Paul's ensuing loss provision makes no reference to a peril, it is unambiguous and does not require construction. The *Chadwick* court imposed the "additional peril" requirement in a case which appears not to have involved ensuing loss clause.

and *must be due to a covered cause of loss.* (Emphasis added.)

While physical loss or damage occurred to Richland's system, it was not due to a covered cause of loss. It is an excluded loss.

## CONCLUSION

Because the undisputed facts establish that Richland's loss is not a covered loss, the trial court should have dismissed Richland's complaint. Since coverage does not exist, there is no basis for Richland's claims for breach of contract and bad faith damages. Our disposition moots the various other issues raised in Richland's cross-appeal, all of which are predicated on the assumption that St. Paul's policy covers Richland's losses.

*By the Court.*—Judgments reversed and remanded with directions to dismiss the complaint.