David ARNOLD and Mary Beth Arnold, Plaintiffs-Appellants,

v.

CINCINNATI INSURANCE COMPANY, Defendant-Respondent,

AMERICAN BUILDING RESTORATION PRODUCTS, INC., ABC Insurance Company, Brent Hongsermeier d/b/a Wall Covering Arts a/k/a Beautiful Restorations, General Casualty Company of Illinois, Hallman Lindsay Paint and DEF Insurance Company, Defendants.

Court of Appeals

No. 03–2483. Submitted on briefs June 4, 2004.—Decided September 23, 2004.

2004 WI App 195

(Also reported in 688 N.W.2d 708.)

763

764

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Alexander S. Kammer* of *Atterbury & Kammer, S.C.*, Middleton.

On behalf of the defendant-respondent, the cause was submitted on the briefs of *James J. Kriva* and *Matthew W. Moran* of *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee.

Before Deininger, P.J., Dykman and Vergeront, JJ.

¶ 1. VERGERONT, J. David Arnold and Mary Beth Arnold appeal the circuit court's grant of summary judgment in favor of Cincinnati Insurance Company, their homeowner's insurance carrier. The circuit court concluded that certain damages to the exterior and the interior of the Arnolds' home were excluded under either the faulty workmanship exclusion or the faulty materials exclusion or both.

¶ 2. Based on the undisputed facts, we agree with the circuit court that the damage to the exterior of the Arnolds' house for which they seek coverage is excluded under either the faulty workmanship exclusion, the faulty materials exclusion, or both, as is the damage to the interior of the house caused by use of the pressure washer. However, we conclude that any damage to the interior of the house that was caused by rain in conjunction with the damaged caulking is a loss ensuing from the excluded loss caused by faulty workmanship or faulty materials. This ensuing loss is not excluded under those two exclusions; it is not otherwise excepted or excluded under the policy; and is therefore covered. In particular, neither the pollution nor the mold exception applies to this ensuing loss. Because there are genuine issues of material fact on the extent of the

interior damage caused by rain in conjunction with the damaged caulking, the Arnolds are entitled to a trial on this issue.

¶ 3. We also conclude the Arnolds filed this action within one year of the inception of the losses for which they seek coverage. It was therefore timely filed under Wɪs. Sᴛᴀᴛ. § 631.83(1)(a).[1]

¶ 4. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 5. For purposes of this appeal, the facts in this paragraph and paragraphs 6 and 7 are not disputed. During the construction of the Arnolds' home in 1992, the cedar siding was stained with a Hallman Lindsay stain. The siding was restained with the same product in 1995. In late 1998, Arnold[2] observed that the siding was darkening from the original medium brown to a much darker, blackish color. He determined that mold and mildew were growing in the siding and attacking the stain, causing the siding to blacken. Arnold contacted Hallman Lindsay which, in consultation with American Building Restoration Products, Inc. (ABRP), recommended that the cedar siding be cleaned and stripped using ABRP's products and then restained.

¶ 6. Arnold and Hallman Lindsay agreed the Arnolds would pay for the contractor's labor to do this work and Hallman Lindsay would pay for the materials. They also agreed that Brent Hongsermeier of Beautiful Restorations would perform the work according to specifications prepared by ABRP.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

[2] When we refer to "Arnold," we mean David Arnold.

¶ 7. The work began in early June 2001. During the first stage, the mold, mildew and stains on the siding were removed by applying the ABRP stripping product, then rinsing with a pressure washer, then applying a wood restorer, and then rinsing again with the pressure washer. During the second stage, the siding was restained with a different stain. The Arnolds were satisfied with the restained siding, but in the process of removing the old stain, other parts of their house were damaged.

¶ 8. The Arnolds filed this action in May 2002 alleging that the ABRP materials caused extensive damage to the exterior and interior of their house. They asserted claims for negligence and strict product liability against ABRP; negligence against Hongsermeier for failing to take steps to avoid damage to non-wood surfaces when he removed the stain and applied the new stain; and negligence and strict product liability claims against Hallman Lindsay for its materials used to stain their home prior to the work done by Hongsermeier. The complaint also named Cincinnati, alleging that its policy was in effect when the home was damaged by the process of removing the stain and applying the new stain.

¶ 9. Cincinnati moved for summary judgment on the ground that the Arnolds' damages were the direct result of faulty workmanship and faulty materials, which were excluded under the policy. It also asserted that the exceptions from coverage for pollution and mold applied, and that the one-year statute of limitations in Wis. Stat. § 631.83(1)(a) barred the claim under the policy. The Arnolds opposed summary judgment, disputing Cincinnati's construction of the policy exclusions and exceptions and arguing that there were genuine issues of material fact.

770

¶ 10. The Arnolds' submissions showed that during the first stage of the project, Arnold noticed that the ABRP stripping product was causing damage to the exterior of the aluminum windows and to the caulking around the windows. There was damage to the windows, gutters, driveway, porch, patio, roof, and doors due to direct contact with ABRP's stripping product, as well as damage to the interior of their home, including the walls, ceiling, and carpeting, due to water and the stripping product leaking in from the damaged seals of the windows and skylights. Although most of the damage occurred before Labor Day 2001, there was continuing and progressive damage caused by water coming in around the skylights. Arnold's opinion was that the damage to his home resulted from "negligent activity."

¶ 11. On the issue of causation, Cincinnati presented evidence from a Hallman Lindsay representative that failure to take proper measures in applying the stripping product caused stains to the roof, driveway, and windows: specifically, failing to place protective plastic coverings over the windows, failing to place a tarp over the driveway, and misuse of the pressure washer. Cincinnati's expert opined that chemical agents in the stripping product had damaged the windows, including the sealant, and other parts of the exterior of the house. In his opinion this occurred because Hongsermeier did not properly protect the windows and other prefinished metals during the job and did not properly clean up after the job was completed.

¶ 12. In his deposition Hongsermeier disputed that he had improperly used the pressure washer, stating that he had ABRP representatives check the pressure to make sure it was correct. He also stated that he was given no instructions to guard against damage to the exterior of the house or driveway. He did,

he said, tape plastic over the windows and doorframes, but the chemicals in the stripping product caused the tape to fuse with the frames, producing a gooey substance when he pulled off the tape, which removed the paint from the metal. He decided that this was causing at least as much damage as not covering would cause, so he did not cover the windows on the other sides of the house, which resulted in "a little overspray," and some discoloring.

¶ 13. According to Hongsermeier, he gradually increased the concentration of the stripping product at the direction of ABRP because it was not fully stripping the old stain and the mildew. The caulking around the windows began falling off on the first or second day of the job, even before the concentration was increased, and it continued to come off during the job. At one point when Hongsermeier was rinsing the stripping product off, he was aware that water was seeping into the house—he assumed where the caulking had come out —but he was told by either the Hallman Lindsay representative or ABRP to keep going. When Hongsermeier finished the job, he recaulked where the caulking had come off.

¶ 14. The trial court concluded that the faulty workmanship exclusion defeated coverage.

## DISCUSSION

¶ 15. The Arnolds contend on appeal, as they did in the circuit court, that the faulty workmanship exclusion is ambiguous and must therefore be construed in favor of coverage. Cincinnati responds that the circuit court correctly concluded that coverage is excluded by the faulty workmanship and faulty materials provision. In addition, it asserts, the policy's pollution and mold

exceptions defeat coverage and the statute of limitations expired before the action was filed.

¶ 16. A party is entitled to summary judgment if there are no genuine issues of material fact and that party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). We apply the same methodology as the trial court and review de novo the grant or denial of summary judgment. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987).

¶ 17. When we construe an insurance policy, our aim is to give effect to the intent of the parties, expressed in the language of the policy itself. *Folkman v. Quamme*, 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. We give the language its common and ordinary meaning, that is, what a reasonable person in the position of the insured would understand it to mean. *Id.*, ¶ 17. If the language of the policy is ambiguous, we construe it in favor of the insured. *Id.*, ¶ 18.

I. Insurance Policy Coverage

¶ 18. This policy "insure[s] against risks of direct loss to property described in Coverages A [including the Arnolds' home], B and C only if that loss is a physical loss to property;" but the policy excepts from coverage certain causes of loss specified in the "Perils Insured Against" section and excludes certain other causes of loss in the "Exclusions" section. Cincinnati does not dispute that there is coverage for the damages to the Arnolds' home under the general coverage provision we have just quoted. The parties' dispute instead involves

773

the application of the faulty workmanship and materials exclusion and the pollution and mold exceptions, which we examine in turn.

## A. Faulty Workmanship and Materials Exclusions

¶ 19. The Exclusions section of the policy contains the following exclusions in paragraph 2:

> 2. We do not insure for loss to property . . . caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.
>
> . . . .
>
> **c. Faulty, inadequate or defective;**
>
> **(1)** planning, zoning, development, surveying, siting;
>
> **(2)** design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>
> **(3)** materials used in repair, construction, renovation or remodeling; or
>
> **(4)** maintenance;
>
> of part or all of any property whether on or off the resident premises.

We will refer to the exclusion in 2c(2) as the faulty workmanship exclusion and the exclusion in 2c(3) as the faulty materials exclusion.[3]

¶ 20. The Arnolds argue both that the faulty workmanship exclusion is ambiguous and that the "ensuing loss" clause in the introductory language of

---

[3] We also use "faulty" in this opinion as a shorthand for "faulty, inadequate, and defective."

paragraph 2 is ambiguous. They also assert there are disputed issues of fact on whether the damage was caused by the products used or by the manner in which they were used. Cincinnati's position is that, to the extent the cause is the former, the faulty materials exclusion applies, and, to the extent the cause is the latter, the faulty workmanship exclusion applies. The Arnolds do not argue that the faulty materials exclusion does not apply if, or to the extent that, the materials used in stripping caused the damage to their house— except insofar as the ensuing loss clause is ambiguous. Accordingly, in this section we address only their arguments regarding the application of the faulty workmanship exclusion. We address the ensuing loss clause in the next section.

■

¶ 21. The Arnolds argue that the faulty workmanship exclusion is ambiguous for three reasons. First, they assert that "workmanship" is not defined in the policy and the use of the words "construction" and "renovation" would lead a reasonable insured to understand this exclusion to apply only to major construction and renovation activities, not to removing and reapplying stain. We disagree. In the context of a policy covering physical loss to one's residence, a reasonable insured would understand that "workmanship" refers to the quality of work done on the residence regardless of the size or scope of the project. Similarly, the use of the word "repair" would be understood by a reasonable insured to refer to all repairs, regardless of the size. A reasonable insured would understand that "workmanship" includes the quality of work in stripping stain that has become darkened by mold and mildew and would also understand that this work is included within the term "repair."

¶ 22. Second, the Arnolds assert that the exclusion is ambiguous because it does not expressly refer to negligence. The Arnolds contend that a reasonable insured could understand that the exclusion does not apply to negligent conduct in the course of working on a residence, but rather simply means that the insurer is not a guarantor of the quality of the work performed. We have a difficult time understanding this distinction, and the Arnolds do not cite any authority to illuminate it. "Negligent conduct" expresses the legal conclusion that one of the elements of a cause of action for liability based on negligence is present: the failure to exercise ordinary care. *See* WIS JI—CIVIL 1005. However, the exclusion here plainly identifies certain causes of physical loss to the covered property: "faulty, inadequate, or defective . . . workmanship [or] repair"; it is not concerned with theories of liability. *See American States Ins. Co. v. Skrobis Painting & Decorating, Inc.*, 182 Wis. 2d 445, 450, 452–53, 513 N.W.2d 695 (Ct. App. 1994) (application of pollution exclusion does not depend on theories of liability such as negligence, but on whether the damage was caused by "disbursal, release or escape of pollutants"). The conduct encompassed in the faulty workmanship exclusion may be negligent; but the proper inquiry is whether a reasonable insured would understand that the conduct described in the exclusion includes the failures to use protective coverings, to properly use the pressure washer, and to properly clean up. We conclude that a reasonable insured would understand that these failures constitute "faulty, inadequate, or defective . . . workmanship [or] repair."

¶ 23. Third, the Arnolds contend the exclusion may be reasonably understood to apply only to damage to the siding on which the work was being performed,

not to other parts of the house. However, there is nothing in the language of the exclusion to suggest this meaning. The exclusion plainly applies to any loss to the covered property that is caused by the specified activities and events.

¶ 24. We conclude that "faulty, inadequate, or defective . . . workmanship [or] repair" plainly includes the failure to use protective coverings, to properly use the pressure washer and to properly clean up in performing the task of removing and reapplying stain to the siding on the Arnolds' house. Accordingly, any loss caused by this conduct is excluded unless it is an "ensuing loss to [covered property] not excluded or excepted in this policy."[4]

B. Ensuing Loss Clause

¶ 25. The Arnolds contend that the ensuing loss clause is ambiguous because the term "ensuing loss" is so broad that a reasonable insured could understand it to include the damages from: (1) water penetration into the home, which resulted from the damage done to the caulking; (2) the damage to the metallic surfaces of the windows, which resulted, at least in part, from the damage done by the tape and plastic used to shield the windows and doors; and (3) the damage to the roof and driveway, which, resulted from the failure to protect

---

[4] There is, as the Arnolds point out, evidence that ABRP's failure to provide adequate specifications and failure to adequately monitor Hongsermeier's use of its stripping product caused, at least in part, his failures to use protective coverings, to properly use the pressure washer, and to properly clean up. However, that evidence does not affect the conclusion that a reasonable insured would understand that those failures constitute "faulty, inadequate, or defective . . . workmanship [or] repair."

777

them from the stain in the stripping process. Cincinnati's position is that the ensuing loss clause is unambiguous and applies only if there is a "peril [that is] separate and independent in nature from the perils which precede[d] it" and that is covered. Under this construction, Cincinnati asserts, none of the damages to the Arnolds' home are covered, because they were all caused either by faulty workmanship or faulty materials, and not by a "separate and independent peril."

¶ 26. There are errors in each party's analysis. The correct analysis leads us to conclude that certain damage to the interior of the house may be an ensuing loss, depending on how disputed facts are resolved, but that the damage to the exterior of the house plainly is not an ensuing loss.

¶ 27. The parties have brought to our attention no Wisconsin case that construes the term "ensuing loss" in an insurance policy. We therefore begin with an examination of the policy language at issue. As noted above, we are to give words in a policy their common and ordinary meaning, *Folkman*, 264 Wis. 617, ¶ 12, and we may use a dictionary for that purpose. *See Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis. 2d 106, 126–27, 596 N.W.2d 429 (1999) (using a dictionary to establish the common meaning of words in an insurance policy). "Ensue" means to "2: take place afterward," either "a: to follow as a chance, likely, or necessary consequence . . ." or "b: to follow in chronological succession." WEBSTER's THIRD INTERNATIONAL DICTIONARY 756 (1993). Although "ensue" thus has two common meanings, we conclude that only one is reasonable in the context of the ensuing loss clause in this policy. A reasonable insured would understand that an ensuing loss is not simply any loss to covered property that chronologically follows a loss

excluded in subsection 2. If there were no relationship other than this chronology between the excluded loss and the ensuing loss, there would be no logical reason to refer to the ensuing loss in this subsection. Thus, a reasonable insured would understand, based both on logic and on the use of "However" at the beginning of the sentence, that the meaning of "ensuing" here is a loss that follows the excluded loss "as a chance, likely, or necessary consequence" of that excluded loss.

¶ 28. Using this common meaning in the context of the faulty workmanship and faulty materials exclusions, an ensuing loss is a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a "chance, likely, or necessary consequence" of the loss caused by faulty workmanship or faulty materials.

¶ 29. The Arnolds apparently are of the view that it is reasonable to construe ensuing loss as all losses that follow and are a consequence of either faulty workmanship or faulty materials, even if the excluded cause is the only cause of the ensuing loss. This is not a reasonable construction of the ensuing loss clause because it completely eviscerates the preceding sentence, which plainly excludes losses caused by the activities, events, and materials listed in subparagraph c. We conclude that a reasonable insured would understand that, in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded loss, an ensuing loss must result from a cause in addition to the excluded cause.

¶ 30. This meaning of "ensuing loss" is supported by the contrasting introductory language to the exclusions in paragraph 1 of the "Exclusions" section: "1. We will not pay for loss resulting *directly or indirectly*

by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss." (Emphasis added.)[5] Paragraph 1 thus explicitly excludes losses that directly or indirectly result from the listed causes, while paragraph 2 does not exclude losses indirectly resulting from the listed causes.[6] Instead, paragraph 2 contains the ensuing loss clause, which tells an insured that losses indirectly resulting from the listed causes are covered if they are not excepted or excluded elsewhere in the policy.[7]

---

[5] The headings to the exclusions in paragraph 1 are: a. Ordinance or Law; b. Earth Movement; c. Water Damage; d. Power Interruption; e. Neglect; f. War; g. Nuclear Hazard; h. Intentional Loss.

[6] The Exclusions section contains only these two paragraphs.

[7] Our construction of "ensuing loss" appears consistent with that employed by three of the cases cited by Cincinnati: *Schloss v. The Cincinnati Ins. Co.*, 54 F. Supp. 2d 1090, 1094 (M.D. Ala. 1999), *aff'd without opinion,* 211 F.3d 131 (11th Cir. 2000) (The ordinary meaning of "ensuing loss" is not ambiguous: to "ensue" means "to take place afterward; to follow as a chance, likely, or necessary consequence."); *McDonald v. State Farm Fire & Cas. Co.*, 837 P.2d 1000, 1005 (Wash. 1992) (reasonably interpreted, the ensuing loss clause says that if one of the specified uncovered events takes place, any ensuing loss that is otherwise covered by the policy will remain covered); *Alwart v. State Farm Fire & Cas. Co.*, 508 S.E.2d 531 (N.C. App. 1998) (ensuing loss clause is not a grant of coverage for a loss that is otherwise excluded under the policy). We do not discuss these cases in further detail because their results depend on facts that are significantly different from this case, on other policy language different from that before us, or on case law from other jurisdictions.

¶ 31. We do not agree with the Arnolds that, simply because the common meaning of "ensuing" is broad, the clause is ambiguous. Nor do we find persuasive the Fifth Circuit case on which the Arnolds rely: *Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co.*, 857 F.2d 286 (5th Cir. 1988). There the court considered an exclusion for loss caused by "mechanical or machinery breakdown; unless an insured peril ensues, and then only for the actual loss or damage caused by the ensuing peril." *Id.* at 287. The court concluded this clause was ambiguous as to whether "the catastrophic damage to a machine resulting from an initial mechanical breakdown" was an "ensuing peril." *Id.* at 288. The court therefore construed the clause against the insurer. *Id.* However, the court did not explain how it reached this result, other than to say that the result is "further reinforced by the insurance broker's testimony that 'mechanical breakdown' exclusions usually are intended to exclude minor maintenance rather than catastrophic damage." *Id.* We do not find any analysis in *Lake Charles* that is helpful in construing the ensuing loss clause here.

¶ 32. Having construed the ensuing loss clause as a reasonable insured would understand it, we now apply that construction to the facts of this case. At this point, a Wisconsin case applying a similar clause is instructive. In *Richland Valley Products, Inc. v. St. Paul Fire & Cas. Co.*, 201 Wis. 2d 161, 166–67, 548 N.W.2d 127 (Ct. App. 1996), the policy excluded loss to covered property "caused or made worse by" faulty workmanship and contamination, but each of those exclusions was followed by a clause providing that "If a loss that would otherwise be covered results from one of these causes, we'll pay for the direct loss that results." *Id.* The parties did not dispute the meaning of the terms used in

the "resulting loss clause" clause, but, did dispute the application of the clause to the losses that occurred in that case.[8]

¶ 33. In *Richland Valley*, a defect in a coil in a machine used to manufacture ice cream caused the ammonia in the coil to mix with the brine in the vat in which the coil was submerged. That mixing caused salts to crystallize and precipitate out of the solution and clog the piping system to which that machine was connected, forcing the company to shut down its entire manufacturing operation. *Id.* at 166. Because the defect in the coil was caused by defective workmanship, it was necessary to decide whether there was coverage under the resulting loss clause of that exclusion. We concluded that the mixing of the brine and ammonia was contamination, resulting in a loss consisting of impure ammonia, and that loss was therefore not covered. *Id.* at 174–75. We then applied the resulting loss clause of the contamination exclusion to decide whether the loss resulting from the impure ammonia—crystallization and precipitation of salts that spread and clogged the system—was covered. We concluded it was not because the spreading of the salt throughout the system was an additional contamination and therefore excluded. *Id.* at 175.

---

[8] We noted in *Richland Valley Products, Inc. v. St. Paul Fire & Cas. Co.*, 201 Wis. 2d 161, 174 n.3, 548 N.W.2d 127 (Ct. App. 1996), that the parties referred to that clause as the "ensuing loss" clause, and we ourselves used that term in that opinion. However, because that clause used the word "resulting" rather than "ensuing," we refer to it here as the "resulting loss clause." We do not intend thereby to imply any conclusion regarding whether the difference in the wording of the two clauses is significant.

¶ 34. *Richland Valley* provides the following framework for our analysis here: (1) we first identify the loss caused by the faulty workmanship and faulty materials exclusions and exclude that loss; (2) we next identify each ensuing loss, if any—that is, each loss that follows as a chance, likely, or necessary consequence from that excluded loss; and (3) for each ensuing loss we determine whether that is an excepted or excluded loss under the policy.

**[12]**

¶ 35. Turning to the evidence of loss and the causes thereof in this case, we consider first the loss consisting of the deterioration of the caulking, the discoloration or other damage to the window frames and door frames, and the discoloration or other damage to other parts of the exterior of the house and the driveway. There is no dispute that these losses were all caused only by faulty workmanship, faulty materials, or some combination of the two. Therefore, all of these losses are plainly excluded under the policy.

¶ 36. We next consider the damage to the interior of the house. The evidence reasonably suggests two different ways this damage occurred. There is evidence that some of this damage occurred as a result of Hongsermeier using the pressure washer to rinse off the siding, with the water and stripping product leaking through the damaged caulking. There is also evidence that some of this damage occurred because rain came in through the damaged caulking around windows and skylights. (This a reasonable inference from Arnold's deposition testimony that the water leakage continued well after Hongsermeier completed the job.)

¶ 37. As for any damage to the interior caused by leakage from the pressure washer, we conclude, based

on the undisputed facts, that this damage was caused by faulty workmanship. We recognize that there is a dispute over whether Hongsermeier used the pressure washer as instructed. However, while that dispute is material to liability, it is not material to coverage. Even if Hongsermeier used the pressure washer as instructed, there can be no reasonable dispute that spraying water around windows with damaged caulking, so that water and the stripping product leak into the house, is faulty workmanship.

¶ 38. However, the evidence that at least some of the interior damage was caused by rain leaking in through the damaged caulking requires a different analysis. Apparently Cincinnati is of the view that this is not an ensuing loss because it is not a "separate and independent peril." Cincinnati does not base this argument on any policy language. Indeed, although "Perils Insured Against" is the title of the section that explains the risks of loss insured against, nowhere in the body of that section is the term "peril" defined, nor is coverage defined in terms of "perils." Rather, as we have explained above, the policy "insures against risks of direct loss," that is "a physical loss" to the Arnolds' home, unless the loss is caused by events that are specifically excepted or excluded. Thus, there is no requirement in the policy that a loss must be caused by a "peril" in order to be covered.

¶ 39. The case Cincinnati relies on for its position, *Acme Galvanizing Co., Inc. v. Fireman's Fund Ins. Co.*, 221 Cal. App. 3d 170 (Cal. App. 1990), has a differently worded ensuing loss clause, which does refer specifically to "peril" in defining an ensuing loss. The policy under consideration there was an insurance policy for business personal and real property that, in the "Perils

Excluded" section, contained an exclusion for latent defects, followed by this clause: "unless loss by a peril not otherwise excluded ensues and then the Company shall be liable only for such ensuing loss." *Id.* at 174. The court construed this clause to mean a " 'peril,' i.e., a hazard or occurrence which causes a loss or injury, *separate* and *independent* but resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues." *Id.* at 179–80. The construction the court in *Acme* gave that clause is not helpful in construing the ensuing loss clause in Cincinnati's policy, which does not refer to "peril."

¶ 40. We conclude there is no basis in the policy language for limiting the cause of an ensuing loss to a "separate and independent peril." There must, as we have already stated, be a cause in addition to the excluded cause, but nothing in the policy language defines the nature of that cause as Cincinnati proposes. We therefore conclude that loss caused by rain leaking in through the damaged caulking is an ensuing loss.

¶ 41. The third step in the analysis inquires whether loss caused by rain is excepted or excluded elsewhere in the policy. Cincinnati has not brought to our attention any exception or exclusion that would apply to rain. Our own review of the policy does not reveal an exclusion or exception that might arguably apply. There is an exclusion for "water damage" in subparagraph 1(c) of the Exclusions section, but it is specifically defined in a manner that does not include damage from rain.[9] There is also an exclusion for "weather conditions" in subparagraph 2(a) of the Exclu-

---

[9] Paragraph (1) of the Exclusions section provides:

 c. **Water Damage,** meaning:

sions section, but "this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss." Since there are no applicable exclusions in paragraph 1, the exclusion in subparagraph 2(a) plainly does not apply.

¶ 42. In summary, we conclude that, based on the undisputed facts, the faulty workmanship exclusion, the faulty materials exclusion, or both unambiguously exclude the loss consisting of the deterioration of the caulking, the discoloration or other damage to the window frames and door frames, and the discoloration or other damage to other parts of the exterior of the house and the driveway. The faulty workmanship exclusion also unambiguously excludes the loss caused to the interior of the house from use of the pressure washer. However, any loss caused to the interior of the house by rain in conjunction with the damaged caulking is an ensuing loss, and there is no exception or exclusion in the policy for loss caused by rain. It is therefore necessary to consider Cincinnati's contention that the pollution and mold exceptions nonetheless defeat coverage.[10]

(1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by the wind;

(2) water which backs up through sewers or drains; or

(3) water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

[10] The exceptions in the "Perils Insured Against" section, like paragraph 1 of the "Exclusions" section, make no provision

## B. Pollution Exception

¶ 43. Cincinnati argues that the stripping product is a pollutant because it contains "liquid, irritant chemicals." These chemicals, Cincinnati asserts, "directly damaged the exterior finishes of aluminum clad windows and destroyed the weather-tight fit and integrity of windows and skylights allowing water damage." Therefore, in Cincinnati's view, the damage to the Arnolds' home was caused by a "discharge" or "release" of the stripping chemicals and is entirely excluded under the pollution exception. The "Perils Insured Against" section excepts from coverage loss caused by:

> (e) discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C of this policy.

> Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed[.]

Paragraph 1.(c)(4)(e).

¶ 44. Cincinnati focuses its argument on whether the stripping product meets the definition of "pollutant." However, the exclusion requires more than that the stripping product meets the above definition of "pollutant." The loss must be caused by the "discharge, dispersal, seepage, migration, release or escape" of a pollutant. Cincinnati asserts that the stripping product was "discharged" or "released" without analyzing the meaning of those words. In *Peace v. Northwestern Nat'l*

---

for an "ensuing loss." Thus, if the pollution or mold exception to coverage applies, "ensuing" rain damage would arguably also be excepted from coverage.

*Ins. Co.*, 228 Wis. 2d 106, 126–27, 596 N.W.2d 429 (1999), the court construed the words "discharge" and "release" in a pollution exclusion. Consulting a dictionary, the court stated: "In its transitive form, the verb 'discharge' is defined: 'To release, as from confinement . . . .' In its intransitive form, the verb 'discharge' is defined, in part, as 'to pour forth, emit, or release contents.' " (Citation omitted.) Relying on a California case, the court cited with approval the meaning of "release" as "a liberation, freeing, or permitting to escape." *Id.* at 127. Applying these definitions and also the common meanings of "escape" and "dispersal," the court concluded that "when lead based paint either chips, flakes, or deteriorates to dust, that action is a discharge, dispersal, release or escape within the meaning of the terms in the policy."[11] *Id.* at 148.

¶ 45. In this case, the stripping chemicals were applied to the siding to remove materials on the siding —the intended purpose of the product. No reasonable construction of the words "discharge" or "release" in-

---

[11] Cincinnati cites two cases in addition to *Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis. 2d 106, 596 N.W.2d 429 (1999), but neither construes or applies the words "discharge" or "release," and the facts bear no resemblance to the facts of this case: *Production Stamping Corp. v. Maryland Cas. Co.*, 199 Wis. 2d 322, 329–31, 544 N.W.2d 584 (Ct. App. 1996) (applying to soil and groundwater contamination a pollution exclusion that excluded all damages caused by pollution; rejecting argument that there was coverage under the personal injury section of the policy because the contamination was "an invasion of the right of private occupancy"). *Id.* at 330; *American States Ins. Co. v. Skrobis*, 182 Wis. 2d 445, 449, 450, 513 N.W.2d 695 (Ct. App. 1994) (applying a somewhat differently worded pollution exclusion to a fuel spill; rejecting argument that the exclusion had a latent ambiguity because pollution exclusion under prior policy did not apply to construction accidents).

cludes the deliberate application of the stripping product to the siding for that purpose. Nor does the fact that the stripping product may have caused the caulking to deteriorate arguably come within the common definition of "discharge" or "release." Therefore, the damage to the interior of the Arnolds' house, which was caused by rain in conjunction with the damaged caulking, plainly was not caused by the "release" or "discharge" of the chemicals in the stripping product.[12]

¶ 46. We conclude that, based on the undisputed facts, the pollution exception does not apply to the damage caused to the interior of the Arnolds' home by rain in conjunction with the damaged caulking.

C. Mold Exception

¶ 47. The "Perils Insured Against" section also excepts from coverage loss caused by mold. Paragraph 1.(c)(4)(c). Cincinnati makes a brief argument that, because the growth of mold on the earlier stain was the reason the stripping product was applied, none of the Arnolds' damages are covered.

¶ 48. "Cause" is not defined in the policy. Although "cause" as a noun or verb has legal meanings,[13] we are here concerned with its common and ordinary meaning as a reasonable insured would understand it when reading this policy. The verb "to cause" means "1: to serve as cause or occasion of: bring into existence . . . ." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 356 (1993). The noun "cause" in turn is defined in part as: "1a: a

---

[12] We do not decide whether the chemicals in the stripping product meet the definition of "pollutant."

[13] For example, in WIS JI—CIVIL 1500 a person's negligence "caused" the injury or accident if it "was a substantial factor in producing" the injury or accident.

person, thing, fact or condition that brings about an effect or that produces or calls forth a resultant action or state ... b: a reason or motive for an action or condition ...."

¶ 49. The mold from the earlier stain was the reason for the application of the stripping product, and in that sense the mold may be said to have "caused" the application of the stripping product. However, the mold was not the reason for or the occasion of either a *faulty* stripping product or *faulty* application of the stripping product; nor did the mold bring about or produce a *faulty* stripping product or *faulty* application of the stripping product. It is the *faulty* stripping product or its *faulty* application, or both, in conjunction with rain, that caused the loss we are considering. Even if the common meaning of "cause" might be stretched to encompass the relationship between the mold and the faulty stripping product or its faulty application, we are convinced that a reasonable insured would not necessarily understand such a broad meaning. Under any of the dictionary definitions we have cited above, a reasonable insured in the Arnolds' position could understand "cause" to require a relationship between the mold and the faulty stripping product or its faulty application that is plainly lacking here.

¶ 50. We conclude that based on the undisputed facts, the mold exception does not exclude the damage to the interior of the Arnolds' home caused by rain in conjunction with damaged caulking.

II. Statute of Limitations

¶ 51. Cincinnati contends that the Arnolds' claim for coverage under their policy is barred by Wis. Stat. § 631.83(1)(a), which requires that an action on a "fire

790

insurance policy must be commenced within 12 months after the inception of the loss." Cincinnati's position is that "the inception of loss" occurred in 1998 when the mold first began to grow on the siding. The Arnolds reply that they are not seeking coverage for the damage to the siding, but to other parts of the exterior of the house and to the interior.

■

¶ 52. Although the term "fire insurance policy" in WIS. STAT. § 631.83(1)(a) might appear to raise the question whether the statute applies to the Arnolds' policy, case law has established that the term "fire insurance" as used in the statute is a generic term that encompasses all types of property indemnity insurance. *Villa Clement v. National Union Fire Ins. Co. of Pittsburgh*, 120 Wis. 2d 140, 148, 353 N.W.2d 369 (Ct. App. 1984). The Arnolds do not argue that the statute does not apply to their policy, and we take this as a concession that it does. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994) (we may take as conceded a proposition put forth in a responsive brief that is not disputed in the reply brief).

■

¶ 53. However, we agree with the Arnolds that the statute does not bar their claim for damages to the exterior of their house, other than the siding, or for damages to the interior of their house. The physical loss to their house for which the Arnolds seek coverage did not occur before Hongsermeier applied the stripping product to their house. There is no dispute that he began this work in early June 2001. Therefore the action, filed May 21, 2002, was filed within one year of the inception of the loss.

## CONCLUSION

¶ 54. Based on the undisputed facts, the damage to the exterior of the Arnolds' house for which they seek coverage is excluded under either the faulty workmanship exclusion, the faulty materials exclusion, or both, as is damage to the interior of the house caused by use of the pressure washer. However, any damage to the interior of the house that was caused by rain in conjunction with the damaged caulking is a loss ensuing from the excluded faulty workmanship or faulty materials. This ensuing loss is not excluded under those two exclusions; it is not otherwise excepted or excluded under the policy; and it is therefore covered. In particular, neither the pollution or the mold exception applies to this ensuing loss. Because there are genuine issues of material fact on the extent of the interior damage caused by rain in conjunction with the damaged caulking, the Arnolds are entitled to a trial on this issue.

¶ 55. We also conclude the Arnolds timely filed this action within one year of the inception of the losses for which they seek coverage. It was therefore timely filed under WIS. STAT. § 631.83(1)(a).

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.