COURT OF APPEALS
DECISION
DATED AND FILED

December 26, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP588**

STATE OF WISCONSIN

Cir. Ct. No. 2019CV371

IN COURT OF APPEALS
DISTRICT II

CINCINNATI INSURANCE COMPANY,

PLAINTIFF-COUNTER DEFENDANT-RESPONDENT,

V.

JAMES ROPICKY AND REBECCA LEICHFUSS,

DEFENDANTS-COUNTER-PLAINTIFFS-THIRD-PARTY
PLAINTIFFS-APPELLANTS,

V.

INFRATEK ENGINEERING INVESTIGATIONS, LLC AND DONALD L.
KRIZAN,

THIRD-PARTY DEFENDANTS.

APPEAL from orders of the circuit court for Waukesha County: MICHAEL J. APRAHAMIAN, Judge. *Reversed and cause remanded with directions.*

Before Neubauer, Grogan and Lazar, JJ.

¶1      GROGAN, J.   James Ropicky and Rebecca Leichtfuss[1] (collectively "the Ropickys") filed a claim with their insurer, Cincinnati Insurance Company, following substantial—and costly—damage to their home after rain infiltrated it during a severe rainstorm.   Cincinnati largely denied the claim based on its determination that the insurance policy's Construction Defect and Fungi Exclusions applied to bar coverage, and it thereafter sought declaratory judgment that it had complied with the policy's coverage requirements.   Ultimately, the circuit court granted Cincinnati's summary judgment motion, agreeing that the Construction Defect and Fungi Exclusions barred any additional coverage under the policy's terms beyond that which Cincinnati had already paid.   Because we conclude on appeal that the ensuing cause of loss exception to the Construction Defect Exclusion reinstates coverage and because an additional coverage endorsement renders the Fungi Exclusion inapplicable, the circuit court erred in granting summary judgment in Cincinnati's favor.   Accordingly, we reverse and remand for further proceedings.

## I.  BACKGROUND

¶2      The Ropickys purchased an Executive Classic homeowner's insurance policy from Cincinnati for their home located in Wales, Wisconsin.[2]

---

[1]  The caption spells Rebecca Leichtfuss's last name as "Leichfuss," which is how it also appears on the Summons and Complaint; however, we use the spelling Leichtfuss herself uses in her appellate briefs.

[2]  Only James Ropicky is identified as a named insured on the policy; however, it is undisputed that both Ropicky and Leichtfuss reside at the residence.   It is unclear whether Ropicky and Leichtfuss are legally married or whether they were legally married during the relevant time period, although the Ropickys' brief refers to Leichtfuss as Ropicky's wife.   Their legal marriage status, however, is not dispositive as to the issues on appeal.

The policy's coverage term ran from August 24, 2017, to August 24, 2018, with liability limits of $1,835,000 for the dwelling, $367,000 for other structures, and $1,376,250 for personal property.

¶3  During the coverage term, the Ropickys' home, which was built in 2005, sustained significant damage following a May 11, 2018 rainstorm. According to Ropicky, he awoke around 7:00 a.m. that morning to the sound of what he believed to be windblown rain pelting the windows on the northeast side of the home, and he thereafter discovered a significant amount of rainwater entering the Great Room on the home's main level.  Ropicky described the rainwater as both "pouring through the wall" across approximately sixteen feet at the top of the ceiling and "over the top of all the windows," and he observed the water "running over the drywall, the windows, falling onto the sill and starting to pool onto the floor[.]"  Ropicky estimated that rainwater entered the home for approximately ten to fifteen minutes.  Prior to the May 11th storm, neither Ropicky nor Leichtfuss had ever observed rainwater entering the home.

¶4  The Ropickys thereafter submitted an insurance claim with Cincinnati on or around May 30, 2018, in regard to the damage purportedly caused by the May 11th storm.  A Cincinnati adjuster met with the Ropickys a day or two later and recommended that Donald Krizan of Infratek Engineering Investigations, LLC evaluate the damage.  Krizan, a professional engineer, inspected areas of the Ropickys' home on June 7, 2018, and he issued a report detailing his findings approximately one month later (the "July Report").  In the July Report, Krizan highlighted the following:

- Prior to his arrival, another individual, Lee Kaul, had removed siding and other materials from an area of the wall

3

between the home's towers near the Great Room and Exercise Room below;

- Faint water stains on the dining room ceiling on the western side of the home;

- "[D]eterioration of the head jambs" of the windows where water had leaked into the home during the May 2018 rainstorm, with "[t]he deterioration consist[ing] of cracking, pe[e]ling, and warping of the wood surfaces of the jambs";

- "[A] path of storm water penetration and damage to plywood sheathing and structural wall components";

- The rain had "penetrated from the top corner of the wall of the great room (where the wall intersects the bottom edge of the roof of the south tower) to the full height and width of the wall of the exercise room";

- Damage to "plywood sheathing and structural wall components due to the high moisture content and subsequent rot[,]" which included "[a]ll plywood sheathing within the path of storm water penetration suffer[ing] virtual total disintegration[,]" damage to wall studs with the highest amount of damage near the bottom of the wall, and "severe damage" to other areas of wood and plywood.

Krizan's July Report also indicated that rainwater had entered through "a gap between the south tower roof's vertical wall flashing (adjacent to the exterior wall of the great room) and the rain gutter at the edge of the tower roof" and that rainwater would enter the home and cause damage each time it rained, particularly "when wind-driven rain fell against the easterly wall[.]"

¶5      Based on his investigation, which focused only on "visible exposed damage" rather than internal or potentially hidden damage, Krizan concluded that it was his opinion, to "a reasonable degree of engineering probability," that "gaps in [the] vertical wall flashing and other avenues that allowed storm water to penetrate within exterior wall-covering components of the residence were created

during construction of the residence." In other words, Krizan concluded that rainwater entered the Ropickys' home as a result of the construction defects.

¶6 Following Krizan's investigation, Cincinnati issued a letter dated July 17, 2018, reciting that Krizan had "indicated there is an approximate [one-inch] gap from the gutter flashing to the gutter" that had "creat[ed] an opening for the water to enter the wall area behind [the] exterior building finish" and that the gap "was due to faulty workmanship" during the home's construction. Cincinnati therefore determined that water infiltration had occurred over a period of time and that "[w]et and dry rot ha[d] damaged the exterior wood framing behind [the] exterior finish on the back of [the] home." After reciting what it determined to be the relevant policy language—general coverage, the Construction Defect Exclusion, and the Fungi Exclusion—Cincinnati identified the limited portions of the home it would pay the cost to repair. In doing so, Cincinnati indicated the identified coverage was "[b]ased upon the … ensuing cause of loss provision," and it further indicated it was also "investigating whether there is any non-fungi related damage that might" be covered as ensuing physical loss.

¶7 Ultimately, Cincinnati paid $10,000 under the policy's fungi-related coverage and $2,138.53 for other damages falling within the ensuing cause of loss exception to the Construction Defect Exclusion, and it denied coverage for costs associated with remedying and repairing the purported construction defects.

¶8 In November 2018, the Ropickys, who had hired contractors to repair their home, contacted Cincinnati to report the discovery of latent damage stemming from the May 2018 rainstorm and that the damage was therefore significantly greater than what Krizan had discovered during his June 2018

investigation. Based on this discovery, the Ropickys requested that Cincinnati reevaluate and readjust their claim.

¶9 Krizan returned to further inspect the Ropickys' home in November 2018. During this follow-up investigation, Krizan observed "inspection ports" that "had been cut through the interior drywall of the exterior walls" to determine whether the walls had sustained any internal water damage. Krizan issued a follow-up report in February 2019 (the "February Report"), in which he noted "a gap between the flashing and the rain gutter at the edge of the roof, and a gap in the stone veneer on the vertical wall" on the south side of the tower near the Great Room and described it as being "the same condition that was found at the north side of the north tower" near the Great Room during his earlier investigation. Krizan also noted that "no interior leaks were reported to have occurred in the interior" on the south side of the tower, that "dark water stains on the stone veneer" indicated "that storm water runoff from the roofs adjacent to the towers overflowed the gutters and streamed down the surfaces of the stone veneer to the bases of the walls of the towers[,]" and that the overflow was caused by an insufficient roof drainage system rather than any gaps.

¶10 As to damage in other areas of the home, Krizan's report recounted that OSB[3] materials had sustained water damage and that "latent fungal spores" had been "activated by [the] higher moisture content in the OSB," which "subsequent[ly resulted in] fungal growth and wood deterioration[.]" Krizan also opined that damage near the deck that had previously been attached to the rear of

---

[3] "OSB" stands for "Oriented Strand Board," which is a type of wood paneling used in construction. *See Oriented Strand Board (OSB)*, APA – THE ENGINEERED WOOD ASSOCIATION, https://www.apawood.org/osb (last visited Nov. 25, 2024).

the home was likely the result of "design or installation deficiencies" that had "allowed storm water to enter the interior wall structure at the deck's connection points." Based on his observations, Krizan concluded, to "a reasonable degree of engineering probability," that "design or installation deficiencies" resulted in "storm water penetration into the OSB and subsequent fungal growth and wood deterioration as latent fungal spores were activated by higher moisture content in the OSB."

¶11 Cincinnati issued a follow-up letter dated February 21, 2019, after reviewing Krizan's February Report. In that letter, Cincinnati informed the Ropickys that it would "not be making any further payments on [their] claim[,]" again citing the $10,000 it had already paid under what it asserted to be the "fungi coverage limit[][.]" The Ropickys then sought to proceed with the appraisal process set forth in the policy to resolve the "disagreement over the amount of physical loss at the property[.]" Cincinnati, however, indicated it would only "participate in [the] appraisal process to determine the *amount* of loss if a court were to find coverage, but it would not participate in appraisal for the purpose of appraisers determining *whether*" coverage exists.

¶12 Following the Ropickys' attempt to initiate the appraisal process, Cincinnati filed a lawsuit seeking declaratory judgment under WIS. STAT. § 806.04 in late February 2019. Specifically, Cincinnati sought a declaratory judgment that "other than a limit of liability for fungi coverage in the amount of $10,000," which it had already paid, the Ropickys' policy did not provide further coverage for the Ropickys' claimed losses stemming from the May 2018 rainstorm. In asserting that the policy did not provide coverage aside from what it had already paid, Cincinnati pointed to the Construction Defect Exclusion set forth in C. Section I - Exclusions, 1.g.(1) and 1.g.(2) and the terms regarding "Fungi Coverage" set forth

in Section I.A.5.m and Form HR 929 (10/04).[4]   The Ropickys disputed Cincinnati's assertion that coverage for their claim was limited to $10,000 pursuant to the policy's fungi coverage and filed counterclaims against Cincinnati for breach of contract, declaratory judgment pursuant to § 806.04, and bad faith related to Cincinnati's handling of their claim.[5]

¶13   Extensive discovery and litigation ensued, and the Ropickys eventually moved for partial summary judgment as to their breach of contract claim in July 2022.   In their motion, the Ropickys asserted their home had sustained a loss of approximately $1,030,300 due to the May 2018 rainstorm and generally argued they were entitled to summary judgment on the breach of contract claim based on Cincinnati's purported failure to properly adjust their loss by "fail[ing] to make a payment on the damages in the Great Room and Exercise Room" and in "fail[ing] to assess those areas for hidden losses and resulting losses."   As to the damages to the Great Room and Exercise Room, the Ropickys asserted, broadly speaking, that:   (1) even if Krizan was correct that there was a

---

[4] For readability purposes, this opinion generally omits bolded portions of the insurance policy unless particularly relevant.

[5] The Ropickys also filed a Third-Party Complaint against Infratek Engineering Investigations, LLC and Donald Krizan, asserting claims of negligence, negligent performance of an undertaking as to home inspection and engineering work, and negligent supply of information. The circuit court ultimately granted summary judgment in favor of Infratek and Krizan in its February 2, 2023 written decision and order, and the Ropickys have chosen not to appeal the dismissal of Infratek and Krizan.   It is therefore unnecessary to further address any aspect of the litigation involving Infratek and Krizan as parties.

The Ropickys filed amended counterclaims against Cincinnati in April 2020.   Although the amendment added additional assertions, the overall nature of the three counterclaims—breach of contract, declaratory judgment, and bad faith—remained the same.   Unless otherwise noted, references to the Ropickys' counterclaims refer to the counterclaims as set forth in the amendment.

construction defect,[6] those losses nevertheless fell within the ensuing cause of loss exception to the Construction Defect Exclusion under ***Arnold v. Cincinnati Insurance Co.***, 2004 WI App 195, 276 Wis. 2d 762, 688 N.W.2d 708, and that Cincinnati had never valued or adjusted those losses; and (2) to the extent the insurance policy excluded or limited coverage for fungi-related damages, Cincinnati had failed to value or adjust the losses pursuant to what it described as "a partial exception to the exclusion contained in an endorsement that purports to add coverage for 'Fungi, Wet or Dry Rot' but limits any recovery for mold damage at $10,000."

¶14     Cincinnati opposed the Ropickys' motion for partial summary judgment and also filed its own motion for summary judgment the following month. In opposing the Ropickys' motion, Cincinnati affirmed its position that the Construction Defect Exclusion applied based largely on Krizan's opinion that construction defects existed as to the one-inch gap he observed between the gutter and flashing and as to the design of the gutter system. Cincinnati further asserted that none of the Ropickys' witnesses controverted Krizan's opinion. In regard to the ensuing cause of loss exception, Cincinnati argued first that the Ropickys—not Cincinnati—carried the burden of establishing that the exception applied and that the Ropickys had not even "attempt[ed] to satisfy this burden of proof," and second, that the rainwater damage did not qualify as an ensuing cause of loss

---

[6] The Ropickys conceded that "construction defects contributed to or caused part of the losses on the front and sides of the house" but argued that Cincinnati had not adjusted for ensuing loss as to those areas. (Formatting altered.) They do not concede, however, that construction defects existed so as to trigger the Construction Defect Exclusion as to the extensive damage sustained on the rear of the house in the area of the Great Room and Exercise Room. We highlight their arguments related to the ensuing loss exception, however, because as explained in greater detail below, we assume for the purposes of this opinion that the exclusion applies.

under *Arnold*. Finally, Cincinnati argued that the Fungi Exclusion applied to bar any coverage aside from that which it had already paid. Cincinnati's arguments in its own summary judgment largely mirrored those it set forth in opposing the Ropickys' motion.

¶15 The Ropickys, in response to Cincinnati's briefing, argued that Cincinnati's burden-shifting approach—that the Ropickys bore the burden of establishing that an exception to an exclusion applied—was incorrect because a party moving for summary judgment bears the burden of establishing it is entitled to summary judgment as a matter of law. The Ropickys also continued to both refute Cincinnati's determination that the Construction Defect Exclusion applied to the vast majority of the damage and to argue in the alternative that the ensuing cause of loss exception applied based on *Arnold*.

¶16 As to Cincinnati's assertion that the Fungi Exclusion applied to limit coverage to $10,000, the Ropickys argued that Cincinnati had erroneously "treated Section I(A)(5)(m) as an exclusion[] with an exception[.]" They claimed, to the contrary, that "Section I(A)(5)(m) is not an exclusion at all, but is instead a grant of Additional Coverage." Thus, they argued, because their loss was "initially caused by something other than fungi, wet or dry rot, this provision provides $10,000 of *additional coverage* if fungi, wet or dry rot causes an increase in the amount of the physical loss" and did not, in their case, cap coverage at $10,000.

¶17 The circuit court heard arguments on the cross-motions for summary judgment in October 2022,[7] and it thereafter filed a thirty-page written decision

---

[7] At the hearing, the circuit court also heard arguments as to the Ropickys' outstanding motions to preclude witnesses and motions to compel testimony, and it ultimately denied those

(continued)

and order in February 2023 granting Cincinnati's summary judgment motion and denying the Ropickys' partial motion for summary judgment.[8] Specifically, the court concluded "that the Construction Defect Exclusion along with the Fungi Exclusion in the Policy precludes coverage for the alleged damages, except for the $10,000 limit of additional coverage on the Fungi Exclusion" and that Cincinnati therefore had not breached its contract with the Ropickys. In reaching this conclusion, the court first noted that there was no dispute that the water infiltration resulting from the rainstorm fell within the policy's coverage terms. It then explained that while Cincinnati carried the burden of establishing that an exclusion applied, pursuant to ***Just v. Land Reclamation, Ltd.***, 151 Wis. 2d 593, 605, 445 N.W.2d 683 (Ct. App. 1989), *rev'd on other grounds*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990), the Ropickys carried the burden of establishing "the reinstatement of coverage due to an exception to an exclusion."[9]

¶18 As to the Construction Defect Exclusion, the circuit court determined that the Ropickys' experts failed to rebut Krizan's opinion as to the

---

motions in its written decision and order. The circuit court's rulings on those motions are not before this court on appeal.

[8] The circuit court filed an "Amended Final Declaratory Judgment in Favor of the Cincinnati Insurance Company and Against James Ropicky & Rebecca Leichtfuss" on February 28, 2023. (Formatting altered.) That document affirmed the court's grant of summary judgment in Cincinnati's favor and further confirmed that Cincinnati had paid the $10,000 limit under the policy's "Fungi Coverage," that Cincinnati had "no further coverage obligation under the Policy for the Claim[,]" and that the Ropickys counterclaims were "dismissed on the merits and with prejudice to [their] reinstatement." The Ropickys' Notice of Appeal includes an appeal of the Amended Final Declaration.

[9] On appeal, the parties continue to dispute whether the insurer or the insured carries the burden of establishing that an exception to an exclusion applies. Ultimately, we need not resolve this question because: (1) regardless of whether they carry the burden to establish that the ensuing loss exception to the Construction Defect Exclusion applies, it is clear that the Ropickys have met that burden; and (2) Cincinnati has failed to establish that the Fungi Exclusion applies, and we therefore need not consider whether an exception applies at all.

existence of a construction defect and that, therefore, "there are no disputed issues of fact and no opinion from which the factfinder could conclude that the water intrusion was due to anything other than a construction defect." It then concluded that the Ropickys had failed to establish that the ensuing cause of loss exception applied. Specifically, the court determined that under *Arnold*, the water infiltration resulting from the rainstorm here was "not a loss 'that follows as a chance, likely, or necessary consequence from the excluded loss[,]'" and the ensuing cause of loss exception therefore did not apply.

¶19 According to the circuit court, to interpret the policy such that "all the water damage to the interior of the home is ensuing loss, and the only loss excluded by the Construction Defect Exclusion is the cost to repair the gap which generated the water damage[,]" would be a "nonsensical" interpretation of the ensuing cause of loss exception because it would result in "all of the damage from the defective construction [being considered] an ensuing cause of loss," which would "abrogate[]" the Construction Defect Exclusion. It therefore concluded that the Ropickys had failed to establish that the ensuing cause of loss exception applied and that, consequently, the Construction Defect Exclusion precluded coverage.

¶20 In regard to the Fungi Exclusion, the circuit court rejected the Ropickys' argument that the Fungi Exclusion did not apply because they had purchased the "Additional Coverage endorsement" and instead agreed with Cincinnati that it had established that the Fungi Exclusion applied to bar coverage aside from the $10,000 it had already paid on the Ropickys' claim. Specifically, the court concluded "that mold experts for both sides have confirmed the existence of fungal growth on construction materials taken from the residence" and that the Ropickys' experts failed to rebut both Krizan's observation of "fungus and rot

upon his initial inspection" and Cincinnati's expert's opinion that fungal organisms and decay had been present prior to the May 2018 rainstorm. It therefore concluded that there were no disputed issues of material fact as to whether the Fungi Exclusion applied and ruled in Cincinnati's favor.

¶21 Finally, because it ruled in Cincinnati's favor and held that Cincinnati had not breached its contract with the Ropickys, the circuit court also dismissed, sua sponte, the Ropickys' stayed bad faith claim as a matter of law. Additional facts, including the specific policy language at issue, will be further developed as necessary below.

¶22 The Ropickys appeal.

## II. STANDARD OF REVIEW

¶23 This case comes before us on review of a grant of summary judgment in Cincinnati's favor based on the circuit court's interpretation and application of the terms of the Ropickys' homeowners insurance policy. "Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Talley v. Mustafa*, 2018 WI 47, ¶12, 381 Wis. 2d 393, 911 N.W.2d 55 (quoting *Water Well Sols. Serv. Grp., Inc. v. Consolidated Ins. Co.*, 2016 WI 54, ¶11, 369 Wis. 2d 607, 881 N.W.2d 285); *Romero v. West Bend Mut. Ins. Co.*, 2016 WI App 59, ¶17, 371 Wis. 2d 478, 885 N.W.2d 591. Appellate courts review a grant of summary judgment de novo using the same methodology as the circuit court. *Talley*, 381 Wis. 2d 393, ¶12. In rare circumstances, summary judgment may not be precluded even where a disputed material fact exists. *Byrne v. Bercker*, 176 Wis. 2d 1037, 1045, 501 N.W.2d 402 (1993). Disputed material facts may

13

"become irrelevant if, in giving full benefit to the party against whom summary judgment is sought, the claim nevertheless is barred as a matter of law." ***Id.***

¶24    Reviewing the circuit court's summary judgment decision in this case also requires that we review its interpretation of the Ropickys' homeowners' insurance policy. Interpretation of an insurance contract presents a question of law this court reviews de novo. ***American Fam. Mut. Ins. Co. v. American Girl, Inc.***, 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65.

¶25    In determining whether the Ropickys' claim is covered under the terms of the policy, "our task is to interpret and apply the language of the insurance policy." *See **5 Walworth, LLC v. Engerman Contracting, Inc.***, 2023 WI 51, ¶31, 408 Wis. 2d 39, 992 N.W.2d 31. Interpreting an insurance policy requires that we "determine and give effect to the intent of the contracting parties[,]" and we will construe the insurance policy "as [it] would be understood by a reasonable person in the position of the insured." ***American Girl***, 268 Wis. 2d 16, ¶23. We give the insurance policy language its "common and ordinary meaning[,]" and we construe ambiguous language "in favor of coverage." ***Danbeck v. American Fam. Mut. Ins. Co.***, 2001 WI 91, ¶10, 245 Wis. 2d 186, 629 N.W.2d 150. Language in an insurance policy "is ambiguous 'if it is susceptible to more than one reasonable interpretation.'" ***Folkman v. Quamme***, 2003 WI 116, ¶13, 264 Wis. 2d 617, 665 N.W.2d 857 (quoting ***Danbeck***, 245 Wis. 2d 186, ¶10).

¶26    Our insurance policy interpretation begins by first examining "whether the policy's insuring agreement makes an initial grant of coverage." ***American Girl***, 268 Wis. 2d 16, ¶24. If it does, we next determine whether any exclusion in the policy applies to preclude coverage. ***Id.*** "Exclusions are

narrowly or strictly construed against the insurer if their effect is uncertain[,]" and "[w]e analyze each exclusion separately[.]" *Id.* If any exclusion applies, we then look to whether an exception to the exclusion reinstates coverage. *Id.* "The insured bears the burden of showing an initial grant of coverage, and if that burden is met the burden shifts to the insurer to show that an exclusion nevertheless precludes coverage." *Day v. Allstate Indem. Co.*, 2011 WI 24, ¶26, 332 Wis. 2d 571, 798 N.W.2d 199.

## III. DISCUSSION

¶27 The Ropickys' insurance policy provides coverage for direct accidental physical damage to the home "caused by or resulting from a Covered Cause of Loss" so long as the loss occurs during the coverage period and is not otherwise excluded or limited by other provisions set forth in the policy.[10] Based on our review of the Record and the parties' respective briefs, there does not appear to be any dispute that the Ropickys' claim falls within the policy's initial grant of coverage. We therefore focus our review first on whether an exclusion applies to bar coverage and, if so, whether an applicable exception to that exclusion applies to bring the claim back within the policy's coverage terms. Two policy exclusions are at issue on appeal—the Construction Defect Exclusion and the Fungi Exclusion—and we address each in turn.

---

[10] What constitutes a "Covered Cause of Loss" is set forth in SECTION I - PROPERTY COVERAGES, B. Section I - Covered Causes of Loss. Generally, it provides that Cincinnati will "insure direct 'physical loss' unless the 'physical loss' is" excluded or limited as set forth in the policy.

## A. *The Construction Defect Exclusion*

¶28    Cincinnati first asserts that the policy's Construction Defect Exclusion applies to bar coverage for the Ropickys' claim.  Turning to the relevant policy language, Cincinnati specifically points to the following:

> 1.  "We" do not insure "physical loss" caused by:
>
> ….
>
> g.  Faulty, inadequate or defective:
>
>> (1) Planning, zoning, development, surveying, siting;
>>
>> (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>>
>> (3) Materials used in repair, construction, renovation or remodeling; or
>>
>> (4) Maintenance;
>>
>> of part or all of any property whether on or off the "residence premises".
>>
>> This exclusion g. applies only to Coverages A and B.

(Formatting altered.)[11]   This language sets forth what the parties refer to as the Construction Defect Exclusion.  Cincinnati then points to the following language: "[A]ny *ensuing 'physical loss'* to Covered Property … not precluded by any other provision in this policy is covered."[12]  (Emphasis added.)  This language refers to

---

[11] This policy language is set forth in SECTION I - PROPERTY COVERAGES, C. Section I – Exclusions 1.g.

[12] In full, the exception states:  "Under Section I, C. Section I - Exclusions, Paragraphs 1. and 2., any ensuing 'physical loss' to Covered Property in Section I - Coverages A, B and C not precluded by any other provision in this policy is covered."

what is referred to herein as the "ensuing cause of loss exception" or "ensuing loss exception."

¶29    Based on the above language, Cincinnati argues that because Krizan identified construction defects in his report, which it says the Ropickys failed to refute, the Construction Defect Exclusion applies.  The Ropickys, to the contrary, argue first that their experts opined that either there was no construction defect present in the rear of the house near the area of greatest damage or that they were unable to reach a conclusion given that significant work had been done so as to impede their ability to conclude whether any defect had existed at the time of the May 2018 rainstorm.[13]  This, the Ropickys say, creates a genuine issue of material fact as to whether the Construction Defect Exclusion applies at all.  Second, the Ropickys assert that even if construction defects existed so as to trigger the Construction Defect Exclusion, the damage qualifies as an ensuing cause of loss and that the ensuing cause of loss exception therefore applies to reinstate coverage.[14]

¶30    While the parties clearly dispute whether Cincinnati has successfully established that the Construction Defect Exclusion applies, for the purpose of this opinion, we assume without deciding that it does.  We do so because even if the Construction Defect Exclusion applies, the damage to the Ropickys' home

---

[13] During the summary judgment proceedings, the Ropickys conceded that a construction defect existed as to the stone veneer on portions of the home, which represented a small portion of the damage sustained as a result of the May 2018 rainstorm but appear to assert that the ensuing cause of loss exception nevertheless reinstates coverage.

[14] To the extent Cincinnati asserts that the Ropickys failed to argue the existence of material issues of genuine fact before the circuit court and therefore waived any such argument on appeal, we disagree.

nevertheless constitutes an ensuing cause of loss under the policy's ensuing cause of loss exception and *Arnold*.

¶31 In *Arnold*, we addressed the applicability of an exclusion and ensuing cause of loss exception in an insurance policy similar to the exclusion and exception currently before us in regard to the purported construction defects at the Ropickys' home. In fact, the exclusionary language in *Arnold* is essentially identical to the language in the Ropickys' policy as set forth above. *See Arnold*, 276 Wis. 2d 762, ¶19. There, the Arnolds, who had procured a homeowner's insurance policy from Cincinnati, hired a contractor to clean and strip the cedar siding on their home after observing mold and mildew damage to the siding. *Id.*, ¶¶1, 5-6. During the course of this work, the Arnolds' home sustained both external and internal damage—specifically, they alleged damage to the exterior of the home's windows, including to the caulking around the windows, damage to areas of the home and driveway that had come into direct contact with the stripping material, and interior damage to "the walls, ceiling, and carpeting, due to water and the stripping product leaking in from the damaged seals of the windows and skylights." *Id.*, ¶¶7, 10. There was evidence that at least some of the interior damage resulted from the power washing itself and that other portions of the damage resulted from rainwater entering the home through damaged caulk surrounding the windows and skylight. *Id.*, ¶36.

¶32 Cincinnati sought summary judgment, asserting that the damages to the Arnold home "were the direct result of faulty workmanship and faulty materials, which were excluded under the policy[,]" and the circuit court agreed that the faulty workmanship exclusion applied to bar coverage. *Id.*, ¶¶9, 14. On

appeal, the Arnolds asserted that both the faulty workmanship exclusion[15] and ensuing cause of loss exception were ambiguous. *Id.*, ¶¶15, 20. In reviewing the policy language, we concluded that the faulty workmanship exclusion was not ambiguous and explained that the exclusion unquestionably applied to the "failure to use protective coverings, to properly use the pressure washer and to properly clean up in performing the task of removing and reapplying stain to the siding[.]" *Id.*, ¶24.

¶33 Turning to the applicable ensuing loss provision in the Arnolds' policy, we noted that no prior Wisconsin case had previously construed "the term 'ensuing loss' in an insurance policy." *Id.*, ¶27. In construing the phrase from the perspective of a reasonable insured, we turned to common dictionary definitions of the word "ensue" and determined that "[a] reasonable insured would understand that an ensuing loss is not simply any loss to covered property that chronologically follows a[n excluded] loss" but rather "that the meaning of 'ensuing' here is a loss that follows the excluded loss '*as a chance, likely, or necessary consequence*' of that excluded loss." *Id.* (emphasis added). Thus, "in the context of the faulty workmanship … exclusion[], an ensuing loss is a loss that is not directly caused by faulty workmanship …, but nonetheless follows as a 'chance, likely, or necessary consequence' of the loss caused by faulty workmanship[.]" *Id.*, ¶28. We further explained "that a reasonable insured would understand that, in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded

---

[15] In *Arnold*, Cincinnati argued that both the faulty materials exception and faulty workmanship exclusion applied. *Arnold v. Cincinnati Ins. Co.*, 2004 WI App 195, ¶20, 276 Wis. 2d 762, 688 N.W.2d 708. Because the Arnolds did not contest the applicability of the faulty materials exclusion, we addressed only the applicability of the faulty workmanship exclusion and corresponding exception. *Id.*

loss, an ensuing loss must result from a cause *in addition to* the excluded cause." *Id.*, ¶29 (emphasis added).

¶34    Based on that interpretation, we then applied the following framework wherein we:  (1) "first identif[ied] the loss caused by the faulty workmanship … exclusion[] and exclude[d] that loss;" (2) "identif[ied] each ensuing loss, if any—that is, each loss that follows as a chance, likely, or necessary consequence from that excluded loss; and (3) for each ensuing loss … determine[d] whether that is an excepted or excluded loss under the policy."  *Id.*, ¶34.  As to the first step in that framework, we determined that "the loss consisting of the deterioration of the caulking, the discoloration or other damage to the window frames and door frames, and the discoloration or other damage to other parts of the exterior of the house and the driveway" "were all caused only by faulty workmanship, faulty materials, or some combination of the two."  *Id.*, ¶35. Because those losses fell within the terms of the exclusion, there was no coverage for those losses under the policy.  *Id.*

¶35    Next, we turned to the home's interior damage and noted that the damage could have occurred in multiple ways:  (1) "water and stripping product leaking through" caulking damaged *during* power washing; and (2) rain entering the home through damaged caulking surrounding the windows and skylights.  *Id.*, ¶36.  As to the interior water damage that occurred *during* the power washing, we concluded that such damage was caused by faulty workmanship and was therefore excluded.  *Id.*, ¶37.  The interior water damage "caused by rain leaking in through the damaged caulking[,]" however, qualified as "a cause in addition to the excluded cause" and therefore was *not* excluded because it fell within the policy's ensuing cause of loss exception.  *Id.*, ¶¶38-40.  Accordingly, we held that while some of the damage was excluded due to operation of the faulty workmanship

exclusion, "any loss caused to the interior of the house by rain *in conjunction with the damaged caulking* is an ensuing loss," meaning there was coverage under the policy for such damage so long as coverage was not precluded elsewhere in the policy. *Id.*, ¶42 (emphasis added).

¶36    Relying on *Arnold*, the circuit court here concluded that the ensuing cause of loss exception did not apply to reinstate coverage because "the water intrusion from the defective home construction is not a loss 'that follows as a chance, likely, or necessary consequence from the excluded loss[.]'"  Rather, it said, "[u]nlike *Arnold*, the water infiltration here is not a separate cause of the damage" because "[i]t flows directly from the excluded defective home construction that caused the water to infiltrate the house" as opposed to the rainwater damage in *Arnold*, which it said "was a chance loss caused by rain infiltrating the home through the damaged caulking that itself resulted from the faulty workmanship and that made the interior damage worse than what the faulty workmanship alone caused[.]"  The court further opined that "interpreting the ensuing cause of loss provision" so as to exclude only "the cost to repair the gap which generated the water damage" would be "nonsensical, for then all of the damage from the defective construction is an ensuing cause of loss, and the entire exclusion is abrogated."  We disagree.

¶37    As we explained in *Arnold*, an "ensuing loss" "is a loss that follows the excluded loss 'as a chance, likely, or necessary consequence' of that excluded loss[,]" and "in addition to being a loss that follows as a chance, likely, or necessary consequence of the excluded loss, an ensuing loss must result from a cause *in addition to the excluded cause*."  *Id.*, ¶¶27, 29 (emphasis added).  To determine whether the damage at issue here falls within that characterization, we apply the three-step framework set forth above.

21

¶38 First, we must determine what constitutes the loss resulting from the construction defect. *See id.*, ¶34. Here, that loss is simply the cost to repair the construction defect; thus, the amount to do so is excluded from coverage. Unlike the circuit court, which believed it would be "nonsensical" to conclude that the Construction Defect Exclusion excludes only the cost of correcting the construction defect itself, we conclude that this is precisely how the Construction Defect Exclusion applies as the policy's plain language specifically states that Cincinnati does not "insure '*physical loss*[,]'" defined as "accidental physical loss or accidental physical damage[,]" that is "*caused by* … [f]aulty, inadequate or defective … construction[.]" (Emphases added.) The "physical loss" in this case is the cost of correcting the "[f]aulty, inadequate or defective … construction," and that loss was caused by the mere existence of the defect itself.

¶39 While it may be true that the cost of correcting a defective condition is ultimately minimal in some cases, the cost of doing so may be quite great in others. *See, e.g.*, ***Leep v. Trinity Universal Ins. Co.***, 261 F.Supp.3d 1071, 1084-85 (D. Mont. 2017) (disagreeing with courts concluding that a "broad[] interpretation of ensuing loss provisions … would 'create a virtual if not complete, exclusion of the exclusion'" and explaining that a broad interpretation results in the exclusion of the cost to remedy the faulty workmanship or other defective condition regardless of whether the amount is minor or substantial). Contrary to the circuit court's apparent belief, the cost to correct the "[f]aulty, inadequate or defective … construction" is simply not determinative as to whether or not the Construction Defect Exclusion applies, and construing the exclusion in this manner is certainly not "nonsensical" given that it is based on the exclusion's plain language and what a reasonable insured would expect.

¶40 Having determined that the loss caused by the construction defect is the cost to repair the defect itself, we must next identify whether there was an ensuing loss—whether there was a "loss that follow[ed] as a chance, likely, or necessary consequence from [the] excluded loss[.]" *See Arnold*, 276 Wis. 2d 762, ¶34. Based on *Arnold*, it is clear that the rainwater that entered the Ropickys' home during a severe rainstorm falls within the meaning of "ensuing loss" because the water infiltration was "a chance, *likely*, or necessary consequence from that excluded loss[.]" *See id.* (emphasis added). The construction defect here is the "excluded loss," and the rainwater entered the home through the defective condition—no different than the rainwater entering through the damaged window caulking in *Arnold*—which was, at the very least, a "likely" "consequence." *See id.* Accordingly, the loss that resulted from rainwater entering as a result of the construction defect is an ensuing loss within the terms of the policy language.

¶41 Finally, we must determine "whether [the] loss caused by rain is excepted or excluded elsewhere in the policy." *See id.*, ¶¶34, 41. While Cincinnati argues that the Fungi Exclusion applies to bar coverage, it has not pointed to "any exception or exclusion that would apply to *rain*." *See id.*, ¶41 (emphasis added). Accordingly, unless the Fungi Exclusion applies, which we address in the next section, the ensuing cause of loss exception to the Construction Defect Exclusion reinstates coverage under the policy's terms.

¶42 Notably, courts throughout the country have reached a similar conclusion in broadly construing similar policy language and its application to rainwater damage. For example, in *Eckstein v. Cincinnati Insurance Co.*, 469 F.Supp.2d 444, 447-48 (W.D. Ky. 2007), the homeowners sought coverage under their homeowner's insurance policy following, inter alia, water damage to their home. The policy contained an exclusion similar to the Construction Defect

Exclusion here, which stated that the policy did "not cover any loss caused by the faulty acts, errors or omissions of you or any other person in planning, construction or maintenance[,]" with "construction" being defined as "includ[ing] materials, workmanship, and parts or equipment used for construction or repair." *Id.* at 453. The exclusion also provided that the policy "insure[s] ensuing covered loss unless another exclusion applies." *Id.*

¶43 The *Eckstein* court ultimately agreed with the homeowners' "content[ion] that the major damage in this case is water damage, and, that such damage is an ensuing loss from the faulty construction and, thus, covered by the Policies." *Id.* at 454. Specifically, the court stated that "the polices are clear that faulty construction losses are excluded, but losses taking place afterward, or as a result of faulty construction, are covered[,]" noted that "[t]he exclusions still apply despite the applicability of the ensuing loss provision[,]" and provided the example that "water damage ensuing from a defective roof is covered as an ensuing loss, but the exclusion for faulty construction excludes coverage to repair the roof." *Id.* It further explained that "[s]uch an interpretation is consistent with the reasonable expectations of the insureds." *Id.*[16] *See also Leep*, 261 F.Supp.3d

---

[16] In addressing the ensuing cause of loss exception, the court in *Eckstein v. Cincinnati Insurance Co.*, 469 F.Supp.2d 444, 454 (W.D. Ky. 2007), explained that "[c]ourts have defined an ensuing loss as 'a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a chance, likely, or necessary consequence of the loss caused by faulty workmanship or faulty materials.'" *Id.* (quoting *Atlantic Mut. Ins. Cos. v. Lotz*, 384 F.Supp.2d 1292, 1305 (E.D. Wis. 2005)). *Lotz*, in turn, quoted our *Arnold* interpretation of "ensuing loss[.]" *Lotz*, 384 F.Supp.2d at 1305. *See also Leep v. Trinity Universal Ins. Co.*, 261 F.Supp.3d 1071, 1082-85 (D. Mont. 2017) (explaining jurisdictional split between cases such as *Arnold* that broadly construe the term "ensuing loss" and those that do not and adopting the broader interpretation in concluding that while "cost to repair or replace the furnace venting" was excluded under the faulty workmanship exclusion, "the damage caused by the intrusion of water vapor from the furnace[] is an ensuing loss"); *Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F.Supp.2d 1229, 1235 (N.D. Fla. 2012) ("Given the plain meaning of the policy language, if the faulty workmanship resulted in water intrusion that subsequently resulted in ensuing losses, the

(continued)

at 1084 (reasonable insured "would understand that the faulty workmanship exclusion would exclude from coverage damage to property caused by faulty workmanship" but "would also reasonably understand the ensuing loss provision to provide coverage for any otherwise covered loss that took place … as a consequence or result of the faulty workmanship").

¶44     To be sure, not all courts addressing similar policy language and circumstances have reached this conclusion, and Cincinnati relies on multiple such cases on appeal.  For example, Cincinnati cites to *TMW Enterprises, Inc. v. Federal Insurance Co.*, 619 F.3d 574 (6th Cir. 2010), as one of many instances in which it says courts "have rejected this untenable interpretation of the ensuing cause of loss exception."

¶45     In *TMW Enterprises*, a divided opinion, the insured sought coverage under its insurance policy upon discovering "that the original builder had improperly constructed the exterior walls, leaving them vulnerable to water infiltration."  *Id.* at 575.  Water did, in fact, enter through the improperly constructed walls, leaving the building, as the contractors warned, susceptible to "'potential mold growth' and 'catastrophic' structural failure due to moisture exposure."  *Id.*  The insurer denied the claim based on its conclusion that the damage was excluded under the policy's "'construction defects' and 'wear and tear'" exclusions, and the court agreed.  *Id.* at 575-76.  According to the court, interpreting the policy's language that the exclusion "does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded" as

---

cost to repair the faulty workmanship is excluded but the ensuing losses from the water intrusion are covered.").

"carving out an exception to this exclusion" "would create a virtual, if not complete, exclusion of the exclusion." *Id.* at 575-76. It further opined that where "a policy excludes 'loss or damages … caused by or resulting from … faulty … workmanship … [or] construction' of a building, it should come as no surprise that the botched construction will permit the elements—water, air, dirt—to enter the structure and inside of the building and eventually cause damage to both." *Id.* at 576 (omissions and alteration in original). In other words, it said, construing "ensuing loss" as including coverage for the water damage would "essentially undo[] the exclusion" and that "the number of possibilities for last-in-time 'but for' causes of damage are limited only by the imagination of the reader." *Id.* at 576-77.

¶46     However, as the *Leep* court explained in rejecting *TMW Enterprises* and the corresponding line of cases construing "ensuing loss" more narrowly, a broad interpretation of a policy's "ensuing loss" language does not abrogate or write the exclusion out of the policy as "the exclusion would still apply to exclude the cost of remedying the faulty workmanship" or defective condition even under the broader construction—even if the cost of doing so is minor. *Leep*, 261 F.Supp.3d at 1084-85. Second, it said, the broader interpretation is more aligned with the reasonable insured's expectations, which is particularly relevant where there are multiple reasonable ways to construe the policy's language. *Id.* We note, too, that in highlighting circumstances in which courts have broadly construed the "ensuing loss" language in insurance policies, the *Leep* court specifically cited to our opinion in *Arnold*. *Leep*, 261 F.Supp.3d at 1082-83.

¶47     To the extent Cincinnati relies on cases such as *TMW Enterprises* and encourages this court to follow the narrow interpretation of "ensuing loss" language in insurance policies, we decline to do so. First, we adopted a broader

interpretation of "ensuing loss" language in insurance policies in ***Arnold***, and in doing so, we have already rejected the rationale presented in cases such as ***TMW Enterprises*** that construe such language more narrowly. Second, and perhaps more simply, ***Arnold*** is binding authority on this court, whereas the non-Wisconsin authorities Cincinnati relies upon are not. Based on the foregoing, we conclude that the circuit court erred in holding that the rainwater damage was not an ensuing cause of loss within the meaning of the exception.

¶48 Our conclusion that the rainwater at issue here was an ensuing cause of loss does not, however, end our inquiry as that exception makes clear that it applies only so long as the loss is not otherwise "precluded by any other provision in this policy[.]" We must therefore turn our attention to the Fungi Exclusion, which Cincinnati also argues applies to bar all but a very limited amount of coverage.

### B. The Fungi Exclusion/Fungi Additional Coverage

¶49 Cincinnati next asserts that the Fungi Exclusion provides a separate basis for denying coverage under the policy's terms and that, therefore, even if the ensuing cause of loss exception reinstates coverage, "the damage would nevertheless be excluded under the Fungi Exclusion" and its anti-concurrent cause of loss (ACC) clause.

¶50 The Fungi Exclusion is found in SECTION I - PROPERTY COVERAGES, C. Section I - Exclusions 4.j. and states:

> 4. "We" will not pay for "physical loss" resulting directly or indirectly by any of the following. *Such "physical loss" is excluded regardless of any other cause or event contributing concurrently or in any sequence to the "physical loss".* These exclusions apply whether or not

the "physical loss" event results in widespread damage or affects a substantial area.

….

j. "Fungi", wet or dry rot, or bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.

*This exclusion does not apply*:

(1) When "fungi", wet or dry rot, or bacteria results from fire or lightning; or

(2) To the extent coverage is provided for in Section I, A.5. Section I - Additional Coverage m. Fungi, Wet or Dry Rot, or Bacteria with respect to "physical loss" caused by a Covered Cause of Loss other than fire or lightning.

Direct loss by a Covered Cause of Loss resulting from "fungi", wet or dry rot, or bacteria is covered.

(Emphases added; formatting altered.) We will refer to SECTION I - PROPERTY COVERAGES, A.5. Section I - Additional Coverages m. referenced in the policy language set forth above as the "Fungi Additional Coverage," and it states:

m. Fungi, Wet or Dry Rot, or Bacteria

(1) The amount shown in the Section I - Fungi, Wet or Dry Rot, or Bacteria - Limit of Insurance Schedule is the most "we" will pay at each "location" *under this Additional Coverage* during the "coverage term" for:

(a) The total of all "physical loss" payable under Section I - Property Coverages caused by "fungi", wet or dry rot, or bacteria;

(b) The cost to remove "fungi", wet or dry rot, or bacteria from Covered Property under Section I - Property Coverages;

(c) The cost to tear out and replace any part of the building or other Covered Property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

28

(d) The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria whether performed prior to, during or after removal, repair, restoration or replacement. The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of "fungi", wet or dry rot, or bacteria.

(2) The coverage described in Section I, A.5.m.(1) above only applies when such "physical loss" or costs are a result of a Covered Cause of Loss that occurs during the "coverage term" and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Covered Cause of Loss occurred.

(3) If there is covered "physical loss" to Covered Property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, payment for "physical loss" will not be limited by the terms of this Additional Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the "physical loss". Any such increase in the "physical loss" will be subject to the terms of this Additional Coverage.

This coverage does not increase the limit of insurance applying to the damaged covered property.

(Emphasis added; formatting altered). Finally, the "amount shown in the Section I - Fungi, Wet or Dry Rot, or Bacteria - Limit of Insurance Schedule" states that "this endorsement changes the policy" and provides that the "Limit of Insurance" is "$10,000[.]" (Formatting altered.) Pursuant to the policy's definitions, "'Fungi' means any type or form of fungus, and includes, but is not limited to, any form of mold, mushroom or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi."

¶51 The parties take vastly different approaches in interpreting and applying the language set forth above. According to Cincinnati, the Fungi Exclusion is straightforward: If there is "'[f]ungi', wet or dry rot, or bacteria

29

meaning the presence, growth, proliferation, spread or any activity of 'fungi', wet or dry rot, or bacteria[,]" there is no coverage because the policy does not insure "'physical loss' resulting directly or indirectly" therefrom "regardless of any other cause or event contributing concurrently or in any sequence to the 'physical loss[.]'" And, it says, there is no genuine issue of material fact as to whether fungi, rot, or bacteria caused the damage at least in part because: (1) its fungi expert, Cassidy Kuchenbecker, opined that fungal organisms and fungal decay had been present for numerous years; (2) Krizan had observed rot during both of his inspections; and (3) the Ropickys' "fungi expert, [Payam] Fallah, admitted [that] fungal growth in the Residence caused construction materials to degrade[.]" Cincinnati also argues that the Ropickys' attempt to rely on Anthony Enea and Dr. Jay Karls—who contended they did not observe any such fungi, rot, or bacteria—to establish a genuine issue of material fact was "for naught" because "[w]hile Karls and Enea may have had experience identifying fungi, [the] Ropicky[s] did not submit them as fungi experts."

¶52     Cincinnati next explains that although the policy initially "exclude[s] fungi damage in subparagraph C.4.j. in the Fungi Exclusion[,] [s]ubparagraph (2) of C.4.j. partially reinstates fungi coverage, but only '[t]o the extent coverage is provided for in [Coverage Section A.5.m.] Fungi, Wet or Dry Rot, or Bacteria.'" (Third and fourth alterations in original.) Coverage Section A.5.m., the "Fungi Additional Coverage," in turn, Cincinnati says, only applies if the policy also includes the referenced "Limit Of Insurance Schedule" form, which in this case limits coverage to $10,000 total. All other damage above $10,000, Cincinnati

posits, is excluded from coverage under the Fungi Exclusion on account of the Fungi Exclusion's ACC clause.[17]

¶53    The Ropickys suggest a very different interpretation and understanding of the Fungi Exclusion and its related terms.  While Cincinnati generally refers to the "Fungi, Wet or Dry Rot, or Bacteria - Limit of Insurance Schedule" page, which is the coverage referenced in the "Fungi Additional Coverage" and identifies a $10,000 "Limit of Insurance" as setting forth an *exception* to the Fungi Exclusion, the Ropickys refer to this as the "Fungi Endorsement"—presumably because the first line on that page states "This *Endorsement* Changes the Policy."[18]  (Emphasis added; formatting altered.)

¶54    According to the Ropickys, the circuit court erred in concluding the Fungi Exclusion applies because, they say, the "Fungi Endorsement" rendered the exclusion inapplicable at the outset.  This is so, they say, because the Fungi Exclusion proclaims, in no uncertain terms, that the "*exclusion does not apply*" when the "Fungi Endorsement" is made part of the policy, which it is in this case.  They also point to the Fungi Exclusion's ACC clause and assert that the ACC clause conflicts with what it says is the "Fungi Endorsement's" concurrent clause, thus bolstering their understanding that the Fungi Exclusion does not apply here.

---

[17] In ***McLaughlin v. Gaslight Pointe Condominium Ass'n,*** 2024 WI App 30, ¶¶39-40, 412 Wis. 2d 140, 8 N.W.3d 115, we recently concluded that the fungi exclusion in the insurance policy at issue barred coverage only if "*all* … claimed damages were attributable, at least in part, to mold" but that the fungi exclusion did *not* preclude coverage for damage "attributable to water infiltration or other causes besides mold[.]"  ***Id.*** (emphasis added).  The ***McLaughlin*** analysis would likely apply with equal force here, particularly given that the ACC clause's reference to "[s]uch 'physical loss'" relates directly back to the "physical loss" identified in the preceding sentence, which, as relevant, pertains specifically to "'[f]ungi, wet or dry rot, or bacteria[.]"

[18] It appears that the Ropickys also consider the language of the "Fungi Additional Coverage" as being part of the "Fungi Endorsement."

¶55　As to the terms of the "Fungi Endorsement" itself, the Ropickys suggest that it "focuses on 'cause[s]' whereas the [Fungi] Exclusion focuses on 'result[s],'" meaning that the "Fungi Endorsement" requires that damages be separated into those that are "'caused' by fungi, wet or dry rot, or bacteria, which are subject to the $10,000 limit" and those that are "'caused' by another covered loss" and are therefore *not* limited by the "Fungi Endorsement." (First and third alterations in original.) Not only does such a construction comport with how a reasonable insured would understand the policy, they say, but it also aligns with the conclusion other courts have reached in construing similar language.[19] Finally, the Ropickys assert that even if fungi, rot, or bacteria damage was present prior to the May 2018 rainstorm, Cincinnati has failed to segregate the losses between those that are covered and those that are not and that a genuine issue of material fact therefore remains.[20]

¶56　To resolve the impact of the Fungi Exclusion on this matter, we must interpret the Fungi Exclusion, the "Fungi Additional Coverage," and the "Fungi

---

[19] The Ropickys cite to cases such as *DeFelice v. Federated National Insurance Co.*, 344 So. 3d 797, 803-04 (La. Ct. App. 2022), and *Eckstein*, 469 F.Supp.2d at 455 ("'[T]he loss that followed the water damage was caused by water damage.' It was not caused by mold damage." (citation omitted)).

[20] The Ropickys also assert that they paid "an increased premium of $1,601.00—nearly 100% of the base premium—for Cincinnati's 'Executive Classic' Policy … which provided $10,000 in 'additional coverage' for 'fungi, wet or dry rot, [and] bacteria,' as set forth in the Endorsement." (Alteration in original.) Cincinnati disputes the Ropickys' claim that they paid an increased premium and asserts instead that the additional $1,601.00 charge listed for "Other Coverages, Endorsements and Charges" was solely for the coverage listed under the "Personal Articles Schedule" and that Form HR929 (10/04), which identifies the $10,000 Limit of Insurance, is "'[i]ncluded' in the basic premium." Ultimately, we need not determine whether the Ropickys paid an additional premium or whether the coverage provided on Form HR929 (10/14) was included in the Ropickys' basic premium because that issue is not dispositive and plays little bearing on our interpretation and application of the policy language under the circumstances present here.

Endorsement" as a whole. In doing so, we remain mindful that in interpreting an insurance contract, we "determine and give effect to the intent of the contracting parties[,]" and we will construe the insurance policy "as [it] would be understood by a reasonable person in the position of the insured." *American Girl*, 268 Wis. 2d 16, ¶23. We are also mindful that we give policy language its "common and ordinary meaning[,]" that we construe ambiguous language in favor of the insured, *Danbeck*, 245 Wis. 2d 186, ¶10, and that we construe exclusions narrowly in favor of coverage. *See Wadzinski v. Auto-Owners Ins. Co.*, 2012 WI 75, ¶12, 342 Wis. 2d 311, 818 N.W.2d 819 ("Ambiguities in exclusions to a grant of coverage are construed narrowly, thereby limiting the exclusion."); *see also Folkman*, 264 Wis. 2d 617, ¶16 ("courts construe ambiguities in coverage in favor of the insureds" and "narrowly construe exclusions against insurers").

¶57 At first glance, the Fungi Exclusion generally appears straightforward, as Cincinnati suggests: It begins by stating that Cincinnati "will not pay for 'physical loss' resulting directly or indirectly by any of the following" conditions set forth immediately below, which include "'[f]ungi', wet or dry rot, or bacteria meaning the presence, growth, proliferation, spread or any activity of 'fungi', wet or dry rot, or bacteria." This language, read in isolation, excludes all coverage "for 'physical loss' resulting directly or indirectly" from "'[f]ungi', wet or dry rot, or bacteria," and the ACC clause further explains that that is the case even where "any other cause or event contribut[es] concurrently or in any sequence to the 'physical loss[.]'" Stated otherwise, this language suggests that the mere presence of "'[f]ungi', wet or dry rot, or bacteria" triggers the Fungi Exclusion.

¶58 This seemingly straightforward first impression is not quite so straightforward, however, because the Fungi Exclusion does not end there; rather,

that same section of the policy *also* includes a qualifier stating that "*[t]his exclusion does not apply*" if one of two conditions are present. (Emphasis added.) As relevant here, the policy states that "[t]his exclusion does not apply" "[t]o the extent coverage is provided for in Section I, A.5. Section I - Additional Coverage m. Fungi, Wet or Dry Rot, or Bacteria with respect to 'physical loss' caused by a Covered Cause of Loss other than fire or lightning." (Formatting altered.)

¶59 As previously noted, when interpreting an insurance policy, we do not read the policy's provisions "in isolation, but rather … in the context of the policy as a whole." *Johnson Controls, Inc. v. London Market*, 2010 WI 52, ¶25, 325 Wis. 2d 176, 784 N.W.2d 579. In doing so, we conclude that the Fungi Exclusion's language that "[t]his exclusion does not apply" does not set forth an *exception* to the Fungi Exclusion, as both Cincinnati and the circuit court seemingly believe, but rather that that language introduces two scenarios in which the Fungi Exclusion is *never triggered* in the first instance because its conditions for application are never satisfied—in other words, it narrows the scope of the Fungi Exclusion's otherwise broad applicability.

¶60 We reach this conclusion for multiple reasons. First, "apply," as used in this context, is generally understood to mean "to bring into action," "to put into operation or effect," or "[t]o put into action[.]" *See, e.g.*, *Apply*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/apply (last visited Nov. 5, 2024); *Apply*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=apply (last visited Nov. 5, 2024). Thus, the phrase "does not apply" is readily—and most reasonably—understood to mean that something is *not* brought "into action" or *not* "put into operation or effect[.]" Consequently, "[t]his exclusion does not apply" means that the Fungi Exclusion is not brought "into action" or that it has

not been "put into operation" if either of the identified conditions is satisfied. This is different than reading that language as an exception, particularly given that exceptions simply reinstate coverage where an exclusion is found to apply— exceptions do not negate exclusions at the outset. *See* **American Girl**, 268 Wis. 2d 16, ¶24 ("*if* a particular exclusion applies, we *then* look to see whether any exception to that exclusion *reinstates* coverage" (emphases added)).

¶61 Second, a reasonable insured would read the phrase "[t]his exclusion does not apply" as meaning exactly what it says: *That the Fungi Exception does not apply*—in other words, that its conditions for application are never satisfied— so long as one of the enumerated scenarios exists.

¶62 Third, when the Fungi Exclusion applies, the policy does not provide coverage for "'physical loss' resulting directly or indirectly" from "'[f]ungi', wet or dry rot, or bacteria[.]" The last line of the Fungi Exclusion section, however, states that "[d]irect loss by a Covered Cause of Loss resulting from 'fungi', wet or dry rot or bacteria *is covered*." (Emphasis added.) It is difficult to reconcile these competing provisions unless we construe the former as applying to scenarios in which the Fungi Exclusion *does* apply and the latter as applying in scenarios in which the Fungi Exclusion *does not* apply.[21] This tension is also made apparent in

---

[21] At the summary judgment hearing, the circuit court questioned Cincinnati's attorney as to the statement that "[d]irect loss by a [C]overed [C]ause of [L]oss resulting from fungi, wet or dry rot, or bacteria is covered" and asked counsel to address opposing counsel's argument as to the meaning of that statement. Rather than answer the question directly, Cincinnati's counsel simply stated that his response to opposing counsel's "argument was since he didn't develop[] it I couldn't respond[.]" Regardless of how well the Ropickys' counsel asserted an argument as to the meaning of that clause, it gives this court pause that Cincinnati's counsel essentially failed to respond in a meaningful way as to Cincinnati's understanding of that clause and its interplay with the policy coverage terms at issue. Cincinnati does not develop any persuasive argument regarding this sentence on appeal, either.

comparing the Fungi Exclusion's ACC clause, which *excludes* coverage for "'physical loss' resulting directly or indirectly" from "[f]ungi, wet or dry rot, or bacteria[,]" "*regardless* of any other cause or event contributing concurrently or in any sequence to the 'physical loss'" with both the last line of the Fungi Exclusion and the language in the "Fungi Additional Coverage" stating that where "there is a covered 'physical loss' to Covered Property, *not caused, in whole or in part*, by 'fungi', wet or dry rot, or bacteria, payment for 'physical loss' *will not be limited* by the terms of this Additional Coverage, except to the extent that 'fungi', wet or dry rot, or bacteria *causes an increase in the 'physical loss*[.]'" (Emphases added.) If the "[t]his exclusion does not apply" language simply introduced an exception rather than setting forth circumstances in which the Fungi Exclusion is never triggered, these provisions would make little sense when read together. However, reading "[t]his exclusion does not apply" as introducing circumstances in which the Fungi Exclusion does not apply—which also renders the ACC clause inapplicable in those circumstances—results in a more harmonious reading of these interrelated policy provisions.

¶63 For these reasons, we conclude that the Fungi Exclusion remains inoperative—it does not apply at all—where either of the two circumstances enumerated directly thereafter apply. Thus, to determine whether the Fungi Exclusion applies here, we must determine whether either of those circumstances is present. As relevant, the Fungi Exclusion "does not apply" "[t]o the extent coverage is provided for in Section I, A.5. Section I - Additional Coverage m. Fungi, Wet or Dry Rot, or Bacteria with respect to 'physical loss' caused by a Covered Cause of Loss other than fire or lightning."

¶64 Cincinnati, relying at least in part on *Wadzinski*, 342 Wis. 2d 311, ¶27, suggests that the language "[t]o the extent coverage is provided for in" the

"Fungi Additional Coverage" refers specifically, and only, to the amount of coverage provided therein—$10,000—because, it says, "language in an exclusion providing it does not apply 'to the extent that' the excluded coverage is provided in another part of the policy" simply provides "an assurance that even though the exclusion bars the coverage at issue, the exclusion does not interfere with insuring agreements in other parts of the policy that may provide such coverage." According to Cincinnati, this effectively means that the Fungi Exclusion only does not apply up to the amount of coverage identified in the "Fungi Additional Coverage," here $10,000, but that aside from that identified amount, the Fungi Exclusion, including the ACC clause, does apply.

¶65 *Wadzinski*, however, does not establish a categorical, bright-line rule that "to the extent that," when used in an insurance policy, serves to assure that an "exclusion does not interfere" with coverage provided for elsewhere in the policy; rather, it simply interpreted the phrase "to the extent that" within the context of the policy at issue as a whole. Thus, while Cincinnati's assertion that the phrase "[t]o the extent [that]" ultimately refers to the specific amount of coverage referenced in the "Fungi Additional Coverage" may arguably be reasonable standing alone, in light of the policy *as a whole*, and particularly in light of the relevant policy provisions related to coverage where "'[f]ungi', wet or dry rot, or bacteria" is present, the phrase "[t]o the extent coverage is provided for in" the "Fungi Additional Coverage" section is more reasonably read as meaning something akin to "so long as" or "if" coverage is provided for in the "Fungi Additional Coverage."

¶66 The latter reading is more reasonable in this context for numerous reasons, including that this understanding is what a reasonable insured would understand this language to mean. First, reading "to the extent" as meaning "if" or

"so long as" is more reasonable because the coverage referenced is found within a section of the policy entitled "Additional Coverage." This would suggest to the reasonable insured that the coverage identified therein is in *addition* to coverage found elsewhere in the policy. Cincinnati's interpretation, to the contrary, would actually act to *limit* the coverage to an amount significantly lower than otherwise provided for.

¶67 Second, we cannot separate the phrase "[t]o the extent [that]" from the introductory phrase stating that the Fungi Exclusion "does not apply." Rather, we must read the language together: The Fungi Exclusion "does not apply" "[t]o the extent coverage is provided for in" the "Fungi Additional Coverage" section. To adopt Cincinnati's understanding would result in an interpretation wherein the Fungi Exclusion "does not apply" only as to the amount provided for ($10,000) in the "Fungi Additional Coverage." Beyond that, Cincinnati says, the Fungi Exclusion is operative. However, as explained above, the ACC clause excluding coverage for "'physical loss' resulting directly or indirectly by" "[f]ungi, wet or dry rot or bacteria" regardless of other causes and whether caused concurrently or sequentially, conflicts with the language set forth in the "Fungi Additional Coverage," and both can therefore not be operative. This conflict does not arise, however, when "[t]o the extent" is read as meaning "if" or "so long as." Accordingly, the most reasonable and straightforward reading of the relevant language is that the Fungi Exclusion "does not apply" if, or so long as, coverage is provided for in the referenced "Fungi Additional Coverage" section. Because it is undisputed that the Ropickys' policy includes the "Fungi Additional Coverage," Cincinnati cannot establish that the Fungi Exclusion applies.

¶68 Having determined that the Fungi Exclusion does not apply, we could end our analysis here; however, it is clear that the parties also dispute *how*

the "Additional Coverage" referenced in the Fungi Exclusion section applies. We will therefore briefly address that question for the sake of both completeness and judicial economy.

¶69 The "Fungi Additional Coverage," the text of which is set forth in full above, incorporates the "Fungi Endorsement," which identifies a "$10,000" "Limit of Insurance[.]" This $10,000 is the most Cincinnati will pay "under this Additional Coverage" for, inter alia, "[t]he total of all 'physical loss' payable under Section I - Property Coverages *caused by* 'fungi', wet or dry rot, or bacteria[.]" (Emphasis added.) Importantly, the "Fungi Additional Coverage" clarifies that the $10,000 does *not* limit *other* covered losses that are "*not caused*, in whole or in part, by 'fungi', wet or dry rot, or bacteria"[22] aside from where "'fungi', wet or dry rot, or bacteria causes an increase in the 'physical loss[,]'" at which point the increased amount is limited by the "Fungi Additional Coverage" terms. (Emphasis added.) Finally, we note that the last line of the "Fungi Additional Coverage" section states that it "does not increase the limit of insurance applying to the damaged covered property." This statement confirms that the full policy limits are available in addition to the coverage provided in the Fungi Additional Coverage.

¶70 Taken together, the $10,000 limit does not apply to that portion of the damage that is not caused by fungi, wet or dry rot, or bacteria at all, *even if* fungi, wet or dry rot, or bacteria ultimately caused other portions of the damage, in whole or in part, elsewhere. Consequently, to determine whether the $10,000 limit

---

[22] Again, this is in contrast to the ACC clause that applies when the Fungi Exclusion applies, which further supports our conclusion that the "Fungi Additional Coverage" does not simply provide for a limited exception to the Fungi Exclusion as Cincinnati suggests.

applies to physical loss, it is necessary to first determine what *caused* the claimed damage. Here, if the damage was caused solely by rainwater (or other covered cause), the "Fungi Additional Coverage" does not limit coverage for the Ropickys' claim as to that specific portion of the damage. The "Fungi Additional Coverage" may, however, be triggered if fungi, wet or dry rot, or bacteria at least partially caused the damage, and such coverage may then apply to that portion of the damage up to the limit of $10,000.

¶71 In summary, we conclude that the circuit court erred in holding that the Fungi Exclusion applied and that the "Fungi Additional Coverage" provided for in the Ropickys' policy constituted an exception to the exclusion that, in conjunction with the Fungi Exclusion's ACC clause, limited coverage for all of the Ropickys' claimed damages to $10,000 under the circumstances present here. To the contrary, the Fungi Exclusion does *not* apply to preclude coverage, and the "Fungi Additional Coverage" simply limits the amount Cincinnati is contractually obligated to pay for damage "*caused by* 'fungi', wet or dry rot, or bacteria" to $10,000 while also leaving intact coverage for covered losses "not caused, in whole or in part, by 'fungi', wet or dry rot, or bacteria" as explained above. (Emphasis added.)

### C. *Material Issues of Fact Exist to Preclude Summary Judgment*

¶72 Having construed the relevant policy provisions, the final issue we must address is whether genuine issues of material fact exist so as to preclude summary judgment. After reviewing the parties' submissions and the Record, we conclude such facts do exist, and summary judgment was therefore inappropriate.

¶73 Specifically, although Cincinnati asserts that its fungi expert, Kuchenbecker, opined that samples taken from the Ropickys' home established

that fungal matter was present and that the samples confirmed that water had been infiltrating the Ropickys' home for many years, this is insufficient to establish whether such fungal organisms actually *caused* the damage, and if so, in what amount. At most, and especially because Kuchenbecker did not sample materials from the Ropickys' home until after those materials had first sat outside in a "bagster" at the Ropickys' home subject to various types of inclement weather and then sat in a garbage bag in Krizan's garage for multiple months after Krizan had obtained the sample material, Kuchenbecker's opinion establishes that there *may* have been fungal organisms present in the Ropickys' home and that if so, those fungal organisms *may* have caused, or contributed to, at least some of the damage. This is particularly so in light of the Ropickys' evidence that their experts questioned whether the damage was caused by rot at all and instead suggested that the damage was the result of delamination.

## IV. CONCLUSION

¶74 After sustaining significant damage to their home, the Ropickys sought coverage under their insurance policy with Cincinnati. Cincinnati, however, largely denied the claim based on various exclusions in the policy, and the circuit court agreed with Cincinnati that the policy awarded no further coverage beyond what Cincinnati had already paid. The court erred in doing so, however, and we therefore reverse and remand for the following reasons: (1) assuming the Construction Defect Exclusion applies, the ensuing cause of loss exception applies to reinstate coverage; (2) the Fungi Exclusion does not apply; (3) genuine questions of material fact exist at least as to whether "'[f]ungi', wet or dry rot, or bacteria" *caused* any of the damage to the Ropickys' home, and if so, what portion of the damage is attributable to "'[f]ungi', wet or dry rot, or bacteria"; and (4) only after properly apportioning any damage caused by

41

"'[f]ungi', wet or dry rot, or bacteria" can Cincinnati determine the extent of coverage it is obligated to provide under the terms of Ropickys' policy. Similarly, because issues of material fact remain as to the cost to repair the construction defects (not the ensuing loss), this issue also remains to be addressed on remand.

¶75 Because we conclude the circuit court erred in granting summary judgment in Cincinnati's favor, we also conclude that it erred in sua sponte dismissing the Ropickys' bad faith claim against Cincinnati. Accordingly, on remand, the circuit court is instructed to reinstate the Ropickys' bad faith claim.

*By the Court.*—Orders reversed and cause remanded with directions.

Recommended for publication in the official reports.

No.    2023AP588(C)


¶76    NEUBAUER, J. (*concurring*).  I agree with the majority's analysis of the ensuing loss clause and its ultimate decision to reverse the circuit court's summary judgment order and remand this case.  I write separately because I disagree with the majority's analysis of the Fungi Exclusion and the Fungi Additional Coverage endorsement.  The majority posits that the phrase "[t]his exclusion does not apply" in the exclusion does not introduce an exception, but rather introduces "two scenarios in which the Fungi Exclusion is *never triggered* in the first instance because its conditions for application are never satisfied."  Majority, ¶59.  This reading of the pertinent policy language lacks support in Wisconsin law and does not withstand scrutiny.

¶77    "Insurance policies are construed as they would be understood by a reasonable person in the position of the insured."  ***American Fam. Mut. Ins. Co. v. American Girl, Inc.***, 2004 WI 2, ¶23, 268 Wis. 2d 16, 673 N.W.2d 65.  In my view, a reasonable insured would construe the phrase "[t]his exclusion does not apply" as introducing an exception to the Fungi Exclusion that reinstates coverage if one of the two circumstances that follows that language is present.  This interpretation is consistent with the manner in which our supreme court and this court have interpreted the same language in other policies.  For example, in ***American Girl***, our supreme court considered an exclusion in an insurance policy that barred coverage for "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  ***Id.***, ¶67.  The exclusion concluded with the following sentence:  "This exclusion *does not apply* if the damaged work or the work out of which the damage arises was

performed on your behalf by a subcontractor." ***Id.*** (emphasis added). In analyzing this language, our supreme court wrote that the "exclusion … would operate to exclude coverage … but for the *exception* that specifically restores coverage when the property damage arises out of" a subcontractor's work. ***Id.*** (emphasis added); *see also* **5 Walworth, LLC v. Engerman Contracting, Inc.**, 2021 WI App 51, ¶¶33-34, 399 Wis. 2d 240, 963 N.W.2d 779, *aff'd*, 2023 WI 51, 408 Wis. 2d 39, 992 N.W.2d 31 (construing same language as setting forth "[a]n … exception to that exclusion … for work 'performed on your behalf by a subcontractor.'").

¶78     ***American Girl*** and **5 Walworth** are not outliers in characterizing the phrase "[t]his exclusion does not apply" as identifying an exception that restores coverage. Wisconsin courts have repeatedly described policy language identifying circumstances in which an exclusion "does not apply" as introducing an exception that reinstates coverage. *See, e.g.*, **Vandenburg v. Continental Ins. Co.**, 2001 WI 85, ¶¶13-14, 244 Wis. 2d 802, 628 N.W.2d 876 (describing language in exclusion stating that it "does not apply to" certain activities as setting forth an exception for such activities); **Ruff v. Graziano**, 220 Wis. 2d 513, 519, 521, 583 N.W.2d 185 (Ct. App. 1998) (same); **Heikkinen v. United Servs. Auto. Ass'n**, 2006 WI App 207, ¶10, 296 Wis. 2d 438, 724 N.W.2d 243 (discussing "automobile exclusion" in liability insurance policy and "exception" identifying persons with respect to which the exclusion "does not apply"), *aff'd by an equally divided court*, 2007 WI 124, 305 Wis. 2d 68, 739 N.W.2d 489 (per curiam); **U.S. Fire Ins. Co. v. Good Humor Corp.**, 173 Wis. 2d 804, 828-29, 496 N.W.2d 730 (Ct. App. 1993) (analyzing applicability of "exception" identifying circumstances in which the exclusion "does not apply" to facts presented). We have even described the phrase "does not apply" in other fungi exclusions as setting forth exceptions to those exclusions. *See* **Heinecke v. Aurora Healthcare, Inc.**, 2013 WI App 133, ¶¶4-5,

351 Wis. 2d 463, 841 N.W.2d 52 (construing policy language stating that exclusion "does not apply to any 'fungi' or bacteria that are, are on, or are contained in, a good or product intended for consumption" as setting forth exception to exclusion).

¶79   As these cases demonstrate, the meaning and effect of language in an exclusion that identifies when the exclusion "does not apply" is standard, clear, and well-established.  Consistent with this case law, I conclude that this language in the Fungi Exclusion creates an exception that, in this case, reinstates $10,000 in coverage for fungi remediation pursuant to the terms of the Fungi Additional Coverage endorsement.  It is that simple.

¶80   Perhaps not surprisingly, the majority cites no Wisconsin authority in support of its conclusion that this language does not, in fact, introduce an exception, but instead identifies circumstances in which the exclusion "is *never triggered* in the first instance."  Majority, ¶59.  Its reading of this policy language unnecessarily introduces confusion into this area of Wisconsin insurance law.  Moreover, the majority's reading of the phrase "[t]his exclusion does not apply" falters under its own terms.  The majority contends that this language introduces circumstances in which the exclusion is not triggered because the conditions for its "application are never satisfied[.]"  Majority, ¶59.  That cannot be true here.  The sole "condition" for the Fungi Exclusion's application is the existence of "'physical loss' resulting directly or indirectly" from "'Fungi', wet or dry rot, or bacteria[.]"  If such physical loss is present, the exclusion is triggered and the policy analysis moves to the final step of determining whether any exceptions to that exclusion reinstate coverage.  *See American Girl*, 268 Wis. 2d 16, ¶24.  Though I agree with the majority that certain material factual disputes remain to

3

be resolved at trial, on the current record it appears to be undisputed that the Ropickys' home contains some physical damage that was caused by fungi.

¶81    To be clear, the Fungi Exclusion would *only* bar coverage for physical loss "resulting directly or indirectly" from fungi regardless of whether other causes or events contribute concurrently or in any sequence to the physical loss. *See **McLaughlin v. Gaslight Pointe Condo. Ass'n,*** 2024 WI App 30, ¶40, 412 Wis. 2d 140, 8 N.W.3d 115. But here, the Fungi Exclusion (including the anti-concurrent cause clause) does not apply to exclude coverage for any of the Ropickys' claimed damages because the Ropickys' policy contains the Fungi Additional Coverage endorsement. The inclusion of that additional coverage in the policy triggers the exception to the Fungi Exclusion and renders the exclusion inapplicable.

¶82    Thus, I agree with the majority as to the ultimate effect of the language providing that the Fungi Exclusion does not apply, as well as how the Fungi Additional Coverage applies. I also agree with the majority that there are disputed issues of material fact regarding the cause of the physical loss at issue, and what must be addressed on remand. I disagree only with the majority's contention that the phrase "[t]his exclusion does not apply" in the Fungi Exclusion does not introduce an exception to the exclusion.